W. OSCAR WILLIAMS AND MRS. GEORGIA WILLIAMS, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 16783, 16782. Promulgated April 22, 1929.

*Robert Ash, Esq.,* for petitioners.
*Frank S. Easby-Smith, Esq.,* for respondent.

OPINION.

MILLIKEN: We are concerned with the fair market value of the six promissory notes given on June 20, 1920, in the face amounts of $800,000. There is no disagreement between the parties as to the extent of the gain once the fair market value of the notes is determined. Petitioners raise no question as to the amount of the gain or the taxability thereof as concerns the $650,000 actually paid and received by them in the year 1920. They complain that the amount of the notes remaining unpaid in the sum of $150,000 should not be valued at their face value at the date of receipt for tax purposes.

Counsel for petitioners strenuously contends that we should value the notes as of the date of receipt, i. e., June 20, 1920, unaffected by events transpiring subsequent thereto and within the year 1920.

When property is exchanged for other property, the property received in exchange shall, for the purpose of determining gain or loss, be treated as the equivalent of cash to the extent of its fair market value, if any. See section 202 of the Revenue Act of 1918. In this case petitioners received promissory notes and it is their fair market value that determines the extent of the gain realized. We think that gain should be ascertained as of the date of the receipt of the notes. We think it could not be successfully contended that, if A purchased a building in the year 1920 for $1,000 and then immediately exchanged it for stock in a corporation having a fair market value at the date of the exchange of the $1,000, he has realized a taxable gain by reason of the exchange, and this is true even though during the remainder of the year 1920 and on December 31, 1920, the stock which he received may have increased in value so as to have a fair market value of $5,000, and, conversely, if the stock during the same period and at the end of the year had suffered a reduction in fair market value of $500, that he has suffered a deductible loss for taxation purposes. To attempt to fix and determine the fair market value of property received in exchange at other than the date of the exchange and receipt would inject into such calculations unrealized depreciation or appreciation. In reaching such a conclusion we do not mean to infer that events happening immediately after the exchange may not in a proper case play an important part incident to a valuation.

We therefore proceed to determine the fair market value of the six notes at June 20, 1920. Counsel for petitioners requests us to find a

fair market value which will not be in excess of $162,000. This figure is arrived at by taking the prevailing purchase price of oil production obtaining in the Wichita Falls territory of $600 per barrel and multiplying that sum by the daily production on June 20, 1920, of 270 barrels of oil. In contending for a valuation of only $162,000, he also objects to our giving consideration to the fact that prior to December 31, 1920, the sum of $650,000 was paid on the notes, or that on January 28, 1921, the entire face value of the notes had been paid.

The notes in question were the obligations of the Hobbs Oil Co. That company had title to various oil leases and oil lands which the petitioners and others had sold to C. N. Haskell, and it was a subsidiary of a Delaware corporation that also had large holdings in the State of Texas. The property in question covered thousands of acres of land. We were not informed of the surplus, if any, which the Hobbs Oil Co. may have had on hand at the time the notes were given. The president of the company testified that its stock had been sold to a large number of persons, and one of the reasons the notes were taken was because they did not want the holders of the stock to come back on them for the value of the stock, it having been sold on the strength of the large holdings here in question. Large sums, for all we know, may have been received by the Hobbs Oil Co. from the sale of its stock, or were reasonably expected to be received when the notes here in question were given. We can not agree that the oil production on the day the notes were given should be the sole and only factor entering into the determination of the fair market value of the notes.

It is a matter of common knowledge that purchasers of stock in an oil company may be perfectly willing to pay an amount for its stock out of all proportion to the immediate value of the asset, i. e., oil leases standing behind the stock. The purchasers may be incorrigible optimists and their optimism may cause the corporation to have in its treasury a sum of money having no reasonable proportion to the value of the assets. It seems unreasonable to us in the light of subsequent events that we should take into account the sole factor of the daily oil production and the price at which it could have been sold on June 20, 1920. Within 36 days after the notes were given one of the notes in the amount of $100,000 was paid to the vendors of the property. If the money with which to pay that note was ratably received over the 36-day period, it was received at the rate of $2,777 per day, and by dividing that sum by the daily oil production of 270 barrels, the oil must have sold for a sum in excess of $10 per barrel, even leaving out of consideration the cost of production. Or, if the income was ratably earned over the period June 20 to November 20, during which time $650,000 was paid, it was

received at the rate of over $4,248 per day, and by dividing that sum by the daily production of 270 barrels, the oil must have sold for a sum in excess of $15 per barrel, leaving out of consideration the cost of production. We know that such a price for crude oil did not obtain in the year 1920 in the Wichita Falls territory, for, according to the Survey of Mineral Resources of the United States published by the United States Geological Survey in 1921, the highest price at which crude oil was sold in Texas in 1920 was $3.50 per barrel. So we are reasonably certain that the money with which the notes were paid was not received alone from the sale of the daily oil production. We have used the daily production of oil of 270 barrels because the president of the Hobbs Oil Co. testified the daily production at the close of the year 1920 was approximately the same as at June 20 and we were not advised of discoveries or increased production during the periods involved.

While we do not base our decision alone on the payment of $650,000 made on the notes during the year, we can not close our eyes to it when no explanation whatever is given as to how the money was received with which to make the payments that were made during the year. For all we know the money with which to make the payments that were made may have been in existence or in reasonable contemplation on June 20, 1920. We are satisfied, however, considering the circumstances under which the notes were given, that they may not have been worth their full face value when received by the petitioners. No doubt it might have been necessary to discount their face value in order to arrive at their fair market value. The petitioner asks us to determine the fair market value for all the notes to be $162,000 on June 20, 1920, and, as we have heretofore explained, we are not satisfied that such sum represents the fair market value of the notes on the day they were given.

The petitioner, not having established the fair market value of the notes, we refuse to disturb the determination of the respondent.

*Judgment will be entered for the respondent.*