SEYMOUR SCHULMAN, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 33655-85.      Filed November 29, 1989.

*Donald L. King, Marc P. Jacobs,* and *Jacqueline M. Scheck,* for the petitioner.
*Glorianne Gooding,* for the respondent.

GERBER, *Judge:* Respondent determined deficiencies in petitioner's 1979 and 1980 income taxes of $9,568 and $260,745, and additions to tax under section 6653(a)[1] of $478.40 and $13,038, respectively. By amendment to his answer, respondent alternatively asserted deficiencies of $344,911 and $16,571, and section 6653(a) additions to tax of $17,245 and $829 for 1979 and 1980, respectively. After concessions or agreements by the parties, the issues remaining for our consideration involve the tax consequences, if

---

[1] All section references, unless otherwise indicated, are to the Internal Revenue Code as amended and in effect for the years at issue. All Rule references are to the Tax Court's Rules of Practice and Procedure.

any, upon petitioner's exercise of an option to purchase partnership units in Valley Hospital Medical Center or his subsequent sale of such units. Specifically, we must consider: (1) Whether and to what extent section 83 applies to the grant or exercise of the options, or the sale of the underlying partnership units; (2) whether and to what extent petitioner must realize income from promissory notes received as part of the exchange for his partnership units; (3) whether the statutory period of limitations on assessment had expired regarding the partnership sale issues for 1979; and (4) whether petitioner is liable for additions to tax under section 6653(a) for 1979 or 1980.

## FINDINGS OF FACT

Petitioner, Seymour Schulman, resided in Las Vegas, Nevada, when his petition was filed in this case. The parties' stipulated facts and exhibits are incorporated by this reference.

Valley Hospital Medical Center (Valley), a limited partnership operating a hospital of the same name, employed petitioner as its executive director and administrator beginning in June 1976. Valley Hospital, Inc. (Valley, Inc.), was the general partner of Valley. The stock and partnership units of Valley, Inc., and Valley, respectively, were privately held and not traded on any public market. From June 1976 to December 1977, petitioner worked for Valley without a written contract. On January 1, 1978, petitioner entered into a written employment contract with Valley. Petitioner's duties, under that contract, were to administer the day-to-day hospital operations, as well as plan the hospital's long-range growth.

As part of the contract, petitioner was granted an option to purchase 2,887 Valley partnership units at $39.90 per unit over a 4-year period beginning January 1, 1979, and ending January 1, 1983. The options were subject to restrictions. If petitioner's employment was terminated, for any reason, prior to December 31, 1982, Valley had the right to repurchase all units issued to petitioner at the option price. If Valley repurchased, petitioner would be entitled to (1) 5 percent of the exercise price for each year of ownership, (2) 9-percent interest, and (3) the units'

undistributed share of partnership income. Petitioner could not sell, assign, or otherwise encumber the units prior to December 31, 1982, except to pledge them as collateral to finance the units' purchase, or to transfer them to a corporation wholly owned by petitioner. The terms of any pre-December 31, 1982, loan had to be approved by Valley. Any other voluntary disposition or attempted disposition would result in forfeiture of all Valley partnership units. In the event of any transfer or attempted transfer prior to December 31, 1982, which was due to operation of law, Valley could repurchase the units at $39.90 plus 5 percent per year held plus 9-percent interest. Subsequent to December 31, 1982, Valley had a right of first refusal for petitioner's units and could purchase them at the price offered to any third party.

For the first year, petitioner had until March 31 to exercise the option and pay the option price. Although the exercise may occur up until March 31, the purchase would be "made effective" as of January 1. For each of the next 3 years, petitioner had to exercise the option by January 1 of the respective year. Petitioner was required to exercise the option in writing.

Milton Schwartz (Schwartz), Valley's president, and petitioner negotiated the $39.90 option price. The negotiated price had direct reference to the price Valley paid to buy back the partnership units of petitioner's predecessor, about 1 year earlier. The price paid for the predecessor's units was increased by 5 or 10 percent to reach $39.90.

On or about January 15, 1979, petitioner informed Schwartz that he wished to exercise his option. Schwartz orally consented to allow petitioner to pledge the units, and helped petitioner obtain a bank loan to purchase the units. On or about March 31, 1979, petitioner pledged the partnership units as collateral to secure a $115,191.30 bank loan, the proceeds of which were used to purchase the units.

Meanwhile, early in 1979, Schwartz met with Alan Miller, the president of Universal Health Services, Inc. (Universal), regarding the sale of Valley to Universal. Serious negotiations continued through the first half of 1979. Petitioner, however, was unaware of the proposed sale until April 1979.

Sometime after June 8, 1979, petitioner and Valley entered into a written agreement partially removing the resale restrictions for petitioner's partnership units. Petitioner could sell his partnership units to Universal in the event that the contemplated sale of Valley to Universal was completed during 1979. This agreement was backdated to March 31, 1979. The agreement also mistakenly refers to Universal Health Services of Nevada, the subsidiary that acquired Valley, Inc.'s assets. Universal Health Services of Las Vegas, another subsidiary, acquired the partnership units. No waiver of the restriction on resale, oral or otherwise, was agreed to by the parties prior to June 8, 1980.

Sometime during June 1979, Universal's proposed purchase of Valley fell through because Universal could not obtain financing. Universal and Valley struck a new deal in July and, with some help from Schwartz, Universal persuaded the banks to finance the purchase.

On or about July 31, 1979, Valley's general and limited partners, including petitioner, entered into written agreements with Universal to sell the hospital assets and respective partnership interests at $274.54 per unit. With the exception of petitioner, Universal and the owners of Valley consummated the agreements, and Universal took over operation of the hospital on August 3, 1979. Universal used wholly owned subsidiaries to effect the purchases. Universal Health Services of Las Vegas, Inc., purchased the partnership interests and Universal Health Services of Nevada, Inc., purchased Valley, Inc.'s assets.

Schwartz and Michael Singer (Singer), a tax attorney, advised petitioner that he would receive more favorable tax treatment if he closed the sale of his units 1 year later, in 1980. By waiting until 1980, petitioner would ostensibly receive the more favorable treatment afforded gain from capital assets held more than 1 year. The closing date for sale of petitioner's partnership units was April 1, 1980, exactly 1 year and 1 day from petitioner's payment for the partnership units. Petitioner and Universal entered into an escrow agreement dated July 31, 1979, with Nevada National Bank acting as the escrow agent. Under the escrow agreement, Universal was to deposit $340,000 in escrow

pending the closing of petitioner's sale of his partnership units. Universal deposited the following funds in escrow:

| | |
|---|---|
| Sept. 10, 1979 | $340,000 |
| Apr. 8, 1980 | 359,000 |
| Apr. 10, 1980 | 833 |
| Total | 699,833 |

Petitioner did not control or have access to the escrowed funds, and he was not entitled to interest on the escrowed funds.

On November 9, 1979, petitioner and Universal amended their agreement to provide for an increased price of $285.61 per unit. Singer insisted on the increased price since petitioner's sale would not occur until some months after the other sales. On November 16, 1979, petitioner waived his partnership share of the income from his Valley units for periods after December 31, 1978.

The escrow agent paid the following amounts either to petitioner or on his behalf:

| | |
|---|---|
| Apr. 11, 1980 | $95,000.00 |
| Apr. 25, 1980 | 33,804.50 |
| May 7, 1980 | 572,102.08 |
| May 7, 1980 | 5,844.95 |
| Total | [2]706,751.53 |

Universal paid the $824,556.07 (2,887 units × $285.61 per unit) purchase price balance by means of two negotiable promissory notes with face amounts totaling $124,737. A $77,111 Series A note was payable 7 years and 1 day from the date of execution, with interest payable quarterly at rates varying from 11¾ percent to no less than 9 percent. This note was subordinated to specified Universal senior debt. A $47,626 Series B note was payable 6 years and 1 day from the execution date with interest payable quarterly at 10 percent.

Sidney and Alan Miller organized Universal in 1979 to purchase and operate hospitals. As of December 31, 1979, Universal had total assets of $68 million. Long-term debt

---

[2]The escrow agent's payments ($706,751.53), plus the face of the two notes ($124,737) total $831,488.53, an amount which is $6,932.46 more than the $824,556.07 purchase price. Although the record is "silent" on this point, it appears that $6,932.46 excess may be interest running from Apr. 1.

represented 84.1 percent of capitalization. Universal was considered highly leveraged relative to comparable hospitals or hospital holding companies with debt to capitalization ratios approximating 50 percent. As of December 31, 1980, Universal had $76 million of total assets, and the debt-to-capitalization ratio decreased to 73 percent. After 1980, the debt-to-capitalization ratio dropped further into the 50 and 68 percent range.

Petitioner did not report any income concerning his option to purchase or the sale of partnership units on his 1979 Federal income tax return. On petitioner's 1980 Federal income tax return he reported the realization of $771,917 as the gross sales price of his partnership units, and he recognized $540,890 of the total as long-term capital gain. He improperly elected the installment method of reporting the gain.

The audit of petitioner's 1979 and 1980 returns involved several issues. During 1982, Marcia L. Aguiar (nee Parmeley), respondent's revenue agent who was examining petitioner's 1979 return, realized that the period of limitations on assessment was approaching expiration regarding petitioner's 1979 taxable year. In an August 2, 1982, transmittal letter accompanying a Form 872-A (Special Consent to Extend the Time to Assess Tax), Agent Aguiar wrote:

While considering your Individual Income Tax Return for 1979, we found that the limitation period prescribed by law for assessing additional tax may expire soon. Unfortunately, more time is needed for us to consider the allowability of the losses you deducted with regard to Solar Devices, Inc., a corporation which is currently under audit.

I would appreciate your extending the limitation period, with regard to the deduction of this loss by signing all copies of the enclosed Form 872-A * * * . Failure to sign the Form 872-A will result in our treating any questionable deductions as unallowable and the assessment of additional tax at this time. It will also significantly curtail your appeal rights. If you choose to sign the forms, please sign both copies in the original and return them to me in the enclosed postage paid envelope. If I do not receive the signed copies within two weeks, I will assume that you do not choose to sign them.

Also enclosed, please find a Document Request, Form 4564, with regard to your 1979 and 1980 returns. I am, at this time, opening your 1980 Return for examination. Please call me at your earliest convenience

to arrange a time when I can meet with you to inspect these documents. * * *

Agent Aguiar did not intend to restrict the consent to the Solar Devices, Inc., deduction, although she had the authority to do so. Agent Aguiar's authority to restrict one of several issues in a case was limited to tax shelter cases. For nontax shelter cases, Agent Aguiar was required to obtain a consent for all issues. The record is silent as to whether the Solar Devices, Inc., deduction was a tax shelter issue. When Agent Aguiar intended to restrict a consent to a single issue, she would place the restrictive language on the consent form.

Petitioner executed the Form 872-A on August 17, 1982, and returned it to respondent. The consent executed by petitioner did not contain any conditions or restrictions concerning Solar Devices, Inc., but does include reference to "the amount(s) of any Federal Income tax due on any return(s) made by or for the above taxpayer(s) for the period(s) ended December 31, 1979 * * * ." On February 8, 1983, Richard H. Ruhnau, Group Manager for respondent, countersigned the consent on behalf of Paul R. Dickey, District Director of Internal Revenue, without modifying the form.

## OPINION

### Section 83—The Option Transaction

In 1979, petitioner exercised his option to purchase the partnership units in Valley and subsequently sold the units to Universal. The first issue for our consideration involves the tax consequences which result from the option transaction. Respondent, in the notice of deficiency, determined that realization and recognition of income from the option and sale of partnership units should be reported in the 1980 taxable year. In his amended answer respondent alleged an alternative position that most of the income from the option should have been recognized in 1979. Petitioner, on his 1980 income tax return, reported income, on the installment basis, from the option transaction. Petitioner now argues on brief that respondent's "1979 position" is correct, but that respondent bears the burden of proving the amount, if any,

of income that should have been reported in 1979.[3] Finally, petitioner contends that the statutory period for assessment and collection has expired with respect to the option issue, based on the further contention that the consent to extend the assessment period for 1979 was restricted. We first address the option issue and then address the question of the period of limitation on assessment.

Section 83 applies in general to all transfers of property after June 30, 1969, in connection with the performance of services rendered. Secs. 1.61-2(d)(6), 1.83-8(b)(1), Income Tax Regs. Under section 83, if property is transferred in connection with the performance of services, the fair market value of the property over the amount paid is included in the transferee's gross income in the year his beneficial interest is transferable or no longer subject to a substantial risk of forfeiture. Section 83, however, does not apply at the time of the transfer of an option, if the option does not have a readily ascertainable fair market value. Sec. 83(e)(3). In those instances, however, section 83 applies when the option is exercised or otherwise disposed of. Sec. 1.83-7(a), Income Tax Regs.; *Bagley v. Commissioner,* 85 T.C. 663, 669 (1985), affd. 806 F.2d 169 (8th Cir. 1986).

The regulations promulgated under section 83 provide that ordinarily an option does not have a readily ascertainable fair market value unless the option is actively traded on an established market. Sec. 1.83-7(b)(1), Income Tax Regs. Petitioner's options were not actively traded on an established market. Options which are not actively traded on an established market must meet four tests to be considered as having a "readily ascertainable fair market value." They must be transferable by the optionee, exercisable immediately in full, not subject to conditions that would have a significant effect on the fair market value of the optioned property, and the value of the option privilege must be readily ascertainable. Sec. 1.83-7(b)(2), Income Tax Regs. See *Pagel, Inc. v. Commissioner,* 91 T.C. 200, 209-210 (1988), on appeal (8th Cir., Dec. 12, 1988).

---

[3]It is clear in this case that the burden of proof is upon respondent with respect to issues concerning the option transaction for 1979 because the option issue, as to 1979, is a new matter raised in respondent's amended answer, and not a matter determined in the notice of deficiency. See Rule 142(a); *Weaver v. Commissioner,* 25 T.C. 1067, 1084-1086 (1956).

The options to purchase partnership units in this case were granted in connection with petitioner's Valley employment contract and, accordingly, were transferred in connection with the performance of services. *Bagley v. Commissioner, supra.* Valley, however, was privately held and the underlying partnership units had no public market. With respect to transferability, it appears that the options in this case could only be exercised by petitioner and were clearly subject to underlying restrictions on resale. Additionally, the formula for repurchase upon petitioner's termination would have an effect on the fair market value of the optioned property. Also, considering that the underlying partnership units were privately held and did not have a readily ascertainable value, the option privilege likewise did not have a readily ascertainable value. We accordingly hold that the options in this case did not have a readily ascertainable fair market value. Because section 83 did not apply when the options were granted, we must consider whether section 83 applies upon the exercise of the options.

This case has been complicated because both parties have switched from their original positions. Respondent's apparent primary position is that the major taxable event occurred in 1979 and secondarily, or in the alternative, that it occurred in 1980, as set forth in the notice of deficiency. Petitioner, in his tax return, reported the taxable event as occurring in 1980, but now argues that it was in 1979. Accordingly, to some extent, respondent agrees with petitioner's position regarding 1979.[4] Both parties agree that section 83 is applicable and that there was no taxable event at the time of granting because the option had no readily ascertainable value. At this point the parties diverge and petitioner contends that the units became taxable in January or March of 1979 and that there was no gain because the option price was no more than the market value. Respondent contends that the units became taxable in July or August 1979 and that gain is the difference between the option price and the sale price. We hold that the partnership units became transferable in July 1979 and petitioner

---

[4]Although petitioner is advocating that, to some extent, the option transaction is taxable to him for 1979, petitioner also argues that the period of limitations for assessment has expired with respect to this issue for 1979 and that the tax would not be collectible.

realized ordinary compensation income in that year. Further, petitioner realized a short-term capital gain in 1980 in the amount of the excess received in 1980 over the 1979 fair market value or, in this case, basis.

Section 83 provides for the amount and timing of income from property transferred in connection with the performance of services. A provider of services includes amounts in income at the time the provider's rights in the property are transferable or not subject to a substantial risk of forfeiture, unless the recipient previously disposed of the property in an arm's-length transaction. Sec. 83(a). Where the property is not disposed of in an arm's-length transaction, the market value (determined without regard to restrictions, except nonlapse restrictions) over the amount paid is income from compensation. Sec. 83(a); sec. 1.83-1(a)(1), Income Tax Regs. Where property is disposed of in an arm's-length transaction which is still substantially nonvested, the amount realized over the amount paid is compensation income to the person who performed the services to be reported in accord with his method of accounting. Sec. 1.83-1(b)(1), Income Tax Regs. In addition, the holding period of the optioned property commences when the property is transferable or no longer subject to a substantial risk of forfeiture. Sec. 83(f).

Rights in property are subject to a substantial risk of forfeiture if they are conditioned upon the future performance of substantial services by any individual. Sec. 83(c)(1). Property is not transferred subject to a substantial risk of forfeiture to the extent that the employer is required to pay the fair market value of a portion of such property to the employee upon the return of such property. Sec. 1.83-3(c)(1), Income Tax Regs.

If petitioner's employment was terminated for any reason prior to December 31, 1982, Valley was entitled to repurchase the units pursuant to a formula. The formula repurchase restriction was not removed prior to April 1, 1980. We conclude that petitioner's rights in the property were conditioned on the future performance of substantial services and, therefore, subject to a substantial risk of forfeiture. Sec. 1.83-3(c)(4), Example 1, Income Tax Regs. However, Valley was required to pay petitioner an addi-

tional 5 percent per year and 9-percent interest, or a total of 14 percent, under the buy-back provision. To the extent that Valley was so obligated, petitioner would, in any event, have had compensation income in 1979. Sec. 1.83-3(c)(1), Income Tax Regs. See sec. 1.83-3(c)(4), Example 4, Income Tax Regs. Fourteen percent of $39.90 equals $5.59 per partnership unit ($16,138.33 for 2,887 units) is the minimum amount of compensation income petitioner realized in 1979. Because the units became transferable in that year, as discussed below, petitioner actually realized the excess of the fair market value over option price.

For purposes of section 83, rights in property are transferable only if any transferee's rights are not subject to a substantial risk of forfeiture. Sec. 83(c)(2). The person receiving the property must be able to transfer it to "any person" other than the transferor. Sec. 1.83-3(d), Income Tax Regs. Property is transferable if the person performing the services can sell, assign, or pledge (as collateral for a loan) his interest in the property to any person other than the transferor and if the transferee is not required to give up the property or its value in the event the substantial risk of forfeiture materializes. Sec. 1.83-3(d), Income Tax Regs.

There are a number of possibilities in this case as to when the units could have become transferable. Until December 31, 1982, petitioner could not sell or otherwise transfer units obtained under the option. Petitioner, however, was entitled to pledge units as collateral to finance their initial purchase. Thus, March 31, 1979, the date petitioner pledged the units, is the first possible time the units became transferable. This is the date petitioner contends the units became transferable.

Closer inspection reveals that the pledge date is not the proper time of recognition for tax purposes. Had petitioner terminated his employment prior to December 31, 1982, the units were subject to repurchase by Valley. A transfer by operation of law (i.e., if petitioner failed to make payments on the bank loan) could also have triggered a Valley repurchase. Under any of these contingencies, the bank/transferee would receive no more than the value computed under the formula to be used for Valley's

repurchase prior to December 31, 1982. Under these circumstances, petitioner would have to give up the units or their value if the forfeiture risk materialized. Therefore, the units were not transferable at that time.

The waiver of restrictions on resale, agreed upon sometime after June 8 and "made effective" as of March 31, allowed the partnership units to be sold to Universal. The waiver provided that if the contemplated sale to Universal took place, petitioner would be able to sell the previously restricted partnership units. The contemplated sale took place in late July or early August 1979, allowing petitioner to transfer the units to Universal.

This is the first occasion to interpret the word "any" in the context of section 83. Section 1.83-3(d), Income Tax Regs., provides that the property must be transferable to "any person other than the transferor." Petitioner was able to transfer the property to Universal or back to the transferor, Valley. The parties have not provided much guidance on this point. Petitioner argues for an earlier date which would negate the effect of section 83.[5] One position argued by respondent (July or August 1979 transferability) would require the interpretation of "any" in section 1.83-3(d), Income Tax Regs., as being at least one possible transferee other than the original transferor. Respondent's alternative position (transferability in 1980) would be that it was not transferable if only transferable to one single transferee.

Under the first interpretation, petitioner's units would be transferable when Valley waived the resale restrictions (as soon as the contemplated sale took place) because petitioner was free to sell them to Universal. The units would be transferable notwithstanding that petitioner could only sell them to Universal, and ostensibly not to anyone else. Under the second interpretation, the units would have to be transferable to anyone the recipient chose. Under this interpretation, the units at issue would not be transferable because they could not be sold to *any* transferee, only to Universal. Conversely, the units would not be transferable if

---

[5]Petitioner argues that the units became transferable on Mar. 31, 1979, when he was able to pledge them for his loan. Petitioner's theory continues that the option price and fair market value were the same on Mar. 31, 1979, and, accordingly, did not result in taxable income pursuant to sec. 83.

the recipient could sell the units to anyone but one or two persons or a specific group.

Although neither of these interpretations is without faults, we find that the first is more in accord with the statutory purpose. The broad scheme of section 83 is to tax the recipient on the value of property unless his interest in the property is subject to a substantial risk of forfeiture. S. Rept. 91-552 (1969), 1969-3 C.B. 423, 501. In this situation, petitioner was able to realize the full value of his units as soon as he was able to sell them, in July 1979. That is a major distinction and one that differentiates it from petitioner's mere ability to pledge the property. There was no longer any substantial risk that he would forfeit either the *units* or their *value*. Further, the second interpretation would spawn numerous restrictions that would be meaningless or not permit the statutorily contemplated forfeiture risk to defer taxation. For example, a restriction prohibiting an individual from selling to A would be meaningless if A had nothing to do with and was not interested in the transaction. Similarly, a citizenship restriction might have a valid business or regulatory purpose, but it might not impact significantly the taxpayer's ability to dispose of or realize the value from property.

Accordingly, we hold that petitioner realized ordinary compensation income in July 1979 when the contemplated sale to Universal took place and the waiver on resale restrictions became effective.

The amount of income to be realized for tax purposes is the excess of the fair market value of the property over the amount paid, if any. Sec. 83(a). Fair market value is determined without regard to any restrictions, except those which, under their terms, do not lapse. The formula repurchase restriction does not constitute a "non-lapse" restriction because, under its terms, it would lapse on December 31, 1982. Sec. 83(d). Therefore, the repurchase restriction is not to be considered in determining value. Actual arm's-length sales within a reasonable time before or after the valuation date are the best criteria of market value. *Estate of Andrews v. Commissioner,* 79 T.C. 938, 940 (1982). The arm's-length sale of the other units to Universal, at $274.54 per unit, is the best criteria of fair market value,

and that amount less the exercise price would constitute ordinary income attributable to compensation. We reject petitioner's contentions that Universal overpaid for the hospital. Therefore, petitioner realized $274.54 less $39.90 or $234.64 compensation income per unit in 1979.

Petitioner's basis in the units would be $274.54, the fair market value of the units. See sec. 1012. In addition, the holding period would have commenced in late July or early August 1979. Sec. 83(f). Despite the March 31 date, the waiver would not be effective, at the earliest, until July or August because the contemplated sale was a condition precedent to the waiver's effectiveness. This condition was not illusory and there was no certainty that the sale would take place as of May or June. The sale initially fell through after the waiver, and took place only after the deal had been restructured. Therefore, at the very least, petitioner's holding period in the units could not begin until July or August 1979. Sec. 83(f). We reject any contention that the waiver could be made retroactive to March 31, given the conditions appurtenant to the waiver. In our view, the sole purpose of making the waiver retroactive was to afford petitioner long-term, as opposed to short-term, capital gain treatment.

Petitioner entered into a contract to sell his units in July or August of 1979. By agreement, the sale was not to close, nor would the units be transferred, until April 1, 1980. In addition, petitioner would not receive any amounts until after April 1, 1980. He had no control over escrowed amounts and was not entitled to interest on the escrow funds. The sale price was $285.61 per unit. Therefore, petitioner realized $285.61 less $274.54, or $11.07, per unit on the sale of his units in 1980. This would be a short-term capital gain, because petitioner's holding period was less than 12 months because it did not begin until July or August of 1979.

The next issue is whether petitioner must include in income the amounts realized from the two promissory notes received as part of the purchase price for his partnership units. The contract price was $824,556.07, payable $699,833 through the escrow and $124,737 by means of two promissory notes. Section 1001(b) provides that the amount realized from a sale of property is the sum of any money

received plus the fair market value of the property (other than money) received. The notes represent property other than money. Only in rare and extraordinary circumstances will property be considered to have no fair market value. Sec. 1.1001-1(a), Income Tax Regs. In determining taxable profit from the sale of property, interest-bearing notes representing unconditional promises to pay, given in full payment of the amount due, are valued at face in the absence of evidence to the contrary. *Williams v. Commissioner,* 16 B.T.A. 109 (1929), affd. 45 F.2d 61 (5th Cir. 1930).

The notes given to petitioner had specified maturity dates, and were unconditional and negotiable. Moreover, petitioner has not shown that the rate of interest was below market rates, a factor that could reduce fair market value. See *Goldstein v. Commissioner,* 89 T.C. 535, 547-548 (1987). Petitioner has shown that Universal was initially somewhat undercapitalized and did have some cash-flow problems which may reflect on its stability and solvency. Petitioner, however, has not quantified the effect these items would have on value. Petitioner testified that he could not sell the notes at face value, but offered no plausible reasons or evidence to support this contention. Petitioner has not shown that the notes did not have a fair market value so as to permit exclusion of the notes in calculating his income. Additionally, petitioner has not shown that he was entitled to any discount in valuing the notes. Therefore, he must realize the full value of the notes in computing his short-term capital gain on the sale of his units.

### 1979 Period of Limitations for Assessment

We consider next whether the extension of the limitations period on assessment for petitioner's 1979 taxable year was restricted as it relates to the option transaction under consideration. If we decide this issue for petitioner, the section 83 Valley Hospital option issue, to the extent recognizable in 1979, will be outside the statutory period within which respondent may assess the tax.

Petitioner has made a prima facie case by showing that the notice of deficiency was mailed more than 3 years after his return was filed or due to be filed. Sec. 6501(a) and

(b)(1). Under these circumstances, the burden of going forward with evidence shifts to respondent. *Robinson v. Commissioner*, 57 T.C. 735, 737 (1972). Respondent has satisfied his burden by showing that the parties executed a written consent extending the period of limitations on assessment (sec. 6501(c)(4)), and that the notice of deficiency was mailed prior to the extended period. *Adler v. Commissioner*, 85 T.C. 535, 540-541 (1985). Where, as here, the consent is valid on its face and petitioner asserts that it is restricted or invalid as to certain issues, petitioner is again charged with the burden of going forward and affirmatively showing the invalidity of the written consent. *Crown Willamette Paper Co. v. McLaughlin*, 81 F.2d 365 (9th Cir. 1936); *Concrete Engineering Co. v. Commissioner*, 19 B.T.A. 212 (1930), affd. 58 F.2d 566 (8th Cir. 1932).

Petitioner attempts to carry the last in this series of shifting burdens by offering Agent Aguiar's transmittal letter. Petitioner argues that the transmittal letter expresses respondent's wish or offer to restrict the extension to the Solar Device deduction (an item other than the option transaction), which petitioner contends he relied upon and accepted by returning an executed consent to respondent.

An agreement to extend the statute of limitations for assessment and collection is not a contract but a waiver of a defense. *Stange v. United States*, 282 U.S. 270 (1931); *Piarulle v. Commissioner*, 80 T.C. 1035, 1042 (1983). Contract principles are significant, however, because section 6501(c)(4) requires a written agreement, and we look to the objective manifestations of mutual assent to determine the terms of such agreement. *Piarulle v. Commissioner, supra* at 1042.

In cases where taxpayers executed consents in the belief that they were conditioned upon some event which had or would occur, but failed to reduce their understanding to a writing associated with the consent, we have found the consent to be valid and/or unrestricted. See *Kronish v. Commissioner*, 90 T.C. 684 (1988); *Tallal v. Commissioner*, 77 T.C. 1291 (1981).

In cases where we have granted relief from a consent which appeared valid and/or unrestricted on its face, we

have looked to the documents which were forwarded by the taxpayer with the consent. In *Windfall Grain Co. v. Commissioner*, 23 B.T.A. 725 (1931), the restriction was contained in the taxpayer's letter transmitting the consent to respondent. Similarly, in *Smith v. Commissioner*, T.C. Memo. 1989-87, we held a consent invalid where respondent did not comply with a condition precedent explicitly stated in a taxpayer's letter transmitting the partially executed consent. In *Scheuerman v. Commissioner*, T.C. Memo. 1984-160, we determined, factually, that the taxpayer's letter transmitting the consent did not constitute a statement of conditions or restriction. These cases illustrate that there must be agreement between the parties.

In a case, similar to this one, where the taxpayer relied upon the Commissioner's letter transmitting the consent to the taxpayer for execution, we held that a mistake as to the extension date in the Commissioner's transmittal letter did not support or justify a variance from the intent reflected by the date on the consent. *Marx v. Commissioner*, 13 T.C. 1099, 1104-1105 (1949). In that case the transmittal letter from the Commissioner was a "mimeograph" or some type of pro forma which had been used in a prior year and contained the prior year's date. The consent transmitted by the "mimeograph" contained the correct date and was executed by the taxpayer and returned to the Commissioner for execution. In *Marx v. Commissioner, supra*, the Commissioner did not intend to communicate the "mistaken" date and there was no agreement between the parties, other than that reflected on the consent.

In a case strikingly similar to this case, we found the consent to be unrestricted even though the Commissioner's transmittal letter contained specific reference to some, but not all, of the issues under consideration by the Commissioner. *Sager v. Commissioner*, T.C. Memo. 1988-193. In that case two separate transmittal letters and consents were sent to the same taxpayer in an attempt to extend the period within which to assess for 1978 and 1979. The 1978 transmittal letter had no specific references to the underlying adjustments or issues under consideration, whereas the 1979 transmittal letter referenced two partnership investments without referencing a "Schedule C loss." The tax-

payer in *Sager v. Commissioner, supra,* was held to the unambiguous, unrestricted language of the consent, and we found, in spite of the transmittal, that the taxpayer was aware that the Commissioner was continuing to examine the Schedule C loss. There was, in fact, no agreement between the parties restricting or limiting the terms of the consent.

The above-discussed series of cases reveals that the courts have used similar factors or standards to decide whether a consent is restricted or invalid by reference to another document. First, the restrictive or conditional terms are usually reduced to writing. The writing should be in conjunction with the circumstances surrounding the parties' execution of the consent. *Constitution Publishing Co. v. Commissioner,* 22 B.T.A. 426, 428 (1931). Second, there must be communication and agreement of the terms between the parties.

Here, petitioner signed an agreement that, within the four corners of the document, waived, without conditions or restrictions, the defense concerning the period for the assessment of "any Federal Income tax" due for taxable year 1979. While the transmittal letter clearly referenced the Solar Devices investment in connection with the consent or waiver, respondent's agent did not intend to restrict or limit the terms of the waiver. The language of respondent's agent's transmittal letter references the opening of a second year of the examination and the request for documents with respect to both years. One could interpret the language referencing Solar Devices as an attempt to limit, but doubt would surely set in after considering the inconsistency of an expressed broader examination in terms of years and possibly issues later in the same transmittal letter. Additionally, the terms of the consent or actual agreement forwarded do not comport with the interpretation that respondent's agent intended to limit the issues for 1979. More importantly, it seems incongruous that respondent's agent would either initiate or promote restrictions upon her ability to examine petitioner's tax return. There is no evidence that petitioner had, prior to the transmittal letter, sought to restrict respondent's ability to consider items other than Solar Devices.

Most telling is petitioner's failure to modify the language on the consent or agreement or to confirm or tie down respondent's agent's alleged offer of restriction upon returning the executed consent. We also note that respondent's representative (someone other than the agent who signed the transmittal letter) signed the unrestricted consent. There is no indication as to whether the person who signed the waiver agreement on behalf of respondent was, at the time of execution, aware of the transmittal letter or its contents.

We find that the unrestricted consent is complete and unambiguous on its face and represents the agreement of the parties. Although one may reason or argue that the transmittal letter here contained sufficient verbiage to constitute the terms of a proposed restriction on the consent, we find that no such offer was intended, clearly communicated, or accepted by both parties. Therefore the period for assessment for petitioner's 1979 taxable year remains open with regard to all issues, including the partnership option transactions.

*Section 6653(a)—Additions to Tax*

Respondent also determined additions to tax under section 6653(a) for negligence. Negligence, within the meaning of section 6653, is the lack of due care or the failure to do what a reasonable or ordinarily prudent person would do under the circumstances. *Marcello v. Commissioner*, 380 F.2d 499, 506 (5th Cir. 1967); *Neely v. Commissioner*, 85 T.C. 934, 947 (1985).

Normally, we will not impose an addition for negligence where an understatement is due to a reasonable or good faith, albeit erroneous, interpretation of the law. See, e.g., *Yelencsics v. Commissioner*, 74 T.C. 1513 (1980). This would be especially true in cases involving section 83, where there has been a dearth of case law. However, the record in this case reflects rather blunt attempts to avoid ordinary income taxation on petitioner's option transaction.

We are swayed by the fact that petitioner or Schwartz intentionally backdated or used "as of" dates on documents to make it appear that agreements existed on those dates. More specifically, the waiver on resale restrictions was not

written until after June 8, but was dated March 31. This was apparently an attempt to make it appear that there was a 1-year holding period in order to obtain a tax benefit. Petitioner contends that the waiver on resale restrictions memorialized a prior verbal agreement. However, the reference to the Universal sale renders impossible the existence of a prior agreement executed on March 31. Petitioner, by his own testimony, did not learn about the proposed Universal sale until April 1979. Given petitioner's lack of knowledge on March 31, 1979, about the Universal sale, we do not believe any agreement, verbal or otherwise, was reached prior to May or June of 1979.

In addition, any attempts made to comply with section 83 were not made in good faith. For example, either at the option's exercise or at the sale, an amount of compensation income would be recognized equal to the fair market value of the units over the amount paid. A majority of the partnership units were sold in July or August at $274.54 per unit. We find that petitioner was disingenuous in claiming a $39.90 fair market value for the units, ostensibly realizing the remainder as capital gain. Therefore, we find that the understatements were due to negligence or intentional disregard of rules and regulations, and petitioner is liable for the section 6653(a) additions to tax.

To reflect the foregoing and the parties' concessions,

*Decision will be entered under Rule 155.*