128 T.C. No. 13

UNITED STATES TAX COURT

KEVIN B. KIMBERLIN AND JONI R. STEELE, ET AL.[1], Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 24499-04, 24500-04,   Filed May 8, 2007.
            8752-05.

        X and Y entered into a private placement agreement,
   pursuant to which X would serve as the placement agent for
   the sale of Y's preferred stock.  Y did not adhere to the
   agreement.  A dispute ensued and was later settled.
   Pursuant to the settlement agreement, in 1995 Y issued to X
   warrants to purchase shares of Y preferred stock.  In 1997,
   the warrants were exercised.  R, in his notices of
   deficiency, determined that the warrants were transferred in
   connection with the performance of services, and the income
   from the warrants is taxable in 1997 pursuant to sec. 83,
   I.R.C.

_____

        [1]  Cases of the following petitioners are consolidated
   herewith:  Kevin Kimberlin Partners Ltd. Partnership, Kevin B.
   Kimberlin, Tax Matters Partner, docket No. 24500-04; and Spencer
   Trask & Co. and Subsidiary f.k.a. Spencer Trask Holdings, Inc.
   and Subsidiary, docket No. 8752-05.

    <u>Held</u>:  R's determination is in error because the warrants were not transferred in connection with the performance of services.

    <u>Held</u>, <u>further</u>, the warrants had an ascertainable fair market value on the date of grant in 1995 and are therefore taxable in that year.

<u>Solomon Leo Warhaftiq</u>, David Lederkramer (specially recognized), Peter Adebanjo (specially recognized), and Andre Castaybert (specially recognized), for petitioners.

<u>Lydia Branch</u>, <u>Shawna Early</u>, and <u>Fredrick Mutter</u>, for respondent.

OPINION

FOLEY, <u>Judge</u>:  The issues for decision in these cases are whether:  (1) Warrants issued to petitioners in accordance with a settlement and release agreement were transferred in connection with the performance of services and therefore constitute taxable income pursuant to section 83;[2] (2) the warrants had a readily ascertainable fair market value in 1995, on the date of grant, or in 1997, the year of exercise; and (3) the payment to Kevin

---

    [2]  Unless otherwise indicated, all section references are to the Internal Revenue Code for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Kimberlin (i.e., the warrants transferred to him by Spencer Trask) is a constructive dividend, return of capital, or capital gain.

### Background

Kevin Kimberlin (Mr. Kimberlin) is an investment banker and an 87-percent shareholder of Spencer Trask & Co. (Spencer Trask). Kevin Kimberlin Ltd. Partners (Kimberlin Partners) is a TEFRA partnership that was established on December 28, 1995. Mr. Kimberlin is the sole general partner with a 1-percent interest. The remaining interests in Kimberlin Partners are held by entities partly or wholly owned by Mr. Kimberlin.

Ciena Corp. (Ciena), a Delaware corporation, was formed in 1992 to develop and market dense wavelength division multiplexing systems for long-distance fiberoptic telecommunications networks. Ciena, in need of financing, planned several private stock offerings and a subsequent initial public stock offering. The relationship between Mr. Kimberlin and Ciena began in 1993 when Mr. Kimberlin, through INNO Co., a New York-based investment company that is wholly owned by Mr. Kimberlin, provided Ciena with $190,000 in seed capital and a $300,000 letter of credit pursuant to a stock subscription agreement.

On November 9, 1993, Ciena entered into an exclusive private placement agreement (1993 PPA) with Spencer Trask Ventures

(Ventures).  Ventures, a New York-based investment banking firm that specializes in obtaining early-stage financing for technology companies, is a wholly owned subsidiary of Spencer Trask.  The terms of the 1993 PPA provided that Ventures would attempt to raise $3 million to $5 million through a private placement offering of Ciena stock.  In exchange for such services, Ciena agreed to pay Ventures a cash commission equal to 10 percent of the amount raised and issue Ventures warrants[3] to purchase a number of shares (i.e., based on the number of shares sold in the offering).  The warrants were exercisable for a period of 5 years at $5 per share.

On April 8, 1994, Ciena and Ventures amended the 1993 PPA to allow another investment banking firm to serve as the placement agent for the offering of Ciena series A convertible preferred stock.  These changes were memorialized by an amended private placement agreement (1994 PPA).  The 1994 PPA provided that following Ciena's series A convertible preferred stock offering, Ventures would serve as the placement agent in the offering of

---

[3]  Warrants, also referred to as "stock warrants", are similar to stock options.  They are certificates that allow the owner to purchase a specified number of shares, at a specified time, for a specified price.  Whereas stock options are normally granted to employees, warrants are granted to the general public. They are typically options to purchase stock over a long period and are freely transferable instruments.  Black's Law Dictionary 1617 (8th ed. 2004).

Ciena series B convertible preferred stock (series B offering).
Pursuant to the 1994 PPA, Ciena was obligated to pay Ventures a
cash commission and warrants to purchase a number of shares
(i.e., based on the number of shares sold in the offering) of
series B convertible preferred stock.  In addition, the agreement
provided:

> In the event * * * [Ciena] does not, at its option,
> proceed with the Offering on the terms set forth herein
> * * * [Ciena] will issue to * * * [Ventures] a warrant,
> exercisable for a period equal to the earlier of (x)
> three years or (y) the occurrence of an initial public
> offering, to purchase up to 150,000 shares of Series A
> Preferred at a price of $1.00 per share.

Ciena subsequently decided not to use Ventures as the
placement agent for its series B offering.  Instead, it sold its
series B stock through direct sales methods to institutional and
noninstitutional investors.  In December 1994, Ciena sold
3,549,106 shares of series B stock for $1.50 per share and
received a subscription for another 1 million shares, and in
January and February 1995, sold an additional 2,804,986 shares of
series B stock for $1.50 per share.  Ciena did not adhere to the
1994 PPA, and as a result, Ventures did not have the opportunity
to, and did not, perform any services for Ciena.  Ciena asserted
that the only redress available to Ventures, for Ciena's failure
to use Ventures as the placement agent for the series B offering,
was the damages determined pursuant to the liquidated damages

clause in the 1994 PPA. On December 21, 1994, Ciena sent a letter to Ventures terminating the 1994 PPA and enclosed a warrant for 150,000 shares of Ciena series A convertible preferred stock.

Following Ciena's termination of the 1994 PPA, a dispute arose between Ciena and Ventures. Ventures asserted that, as a result of Ciena's breach of the 1994 PPA, Ciena was liable for full compensatory damages, rather than the liquidated damages delineated in the agreement. On February 10, 1995, Ciena and Ventures settled their dispute pursuant to a settlement and release agreement (SRA). The SRA provided: "[Ciena and] each of * * * [Spencer Trask] and Affiliates agree that, as of the date of this Agreement, the Placement Agreement as amended to date is hereby terminated and of no further force and effect", thus terminating the 1994 PPA.

The SRA also provided for the issuance of warrants to Ventures "exercisable for an aggregate of 300,000 shares of Convertible Preferred Stock, Series B, of Ciena Corporation" at $2 per share. The exercise period for the SRA warrants was the earliest to occur of: 4 years from the date of the SRA, the consummation of any public offering of the company's stock, or the sale of all or substantially all of the company's assets. The SRA further provided for Ciena to pay $35,000 of legal fees

Ventures incurred in preparation of documents relating to the 1993 PPA and the 1994 PPA.  In addition, Spencer Trask, Ventures, and each of its affiliates agreed to "forever release, acquit and discharge [Ciena] * * * of and from the * * * [Spencer Trask] claims and from any and all causes of action".

Following the execution of the SRA, Ventures designated Mr. Kimberlin to receive warrants to purchase 250,000 shares of Ciena stock, Spencer Trask to receive warrants to purchase 45,000 shares, and Laura McNamara to receive warrants to purchase 5,000 shares.  On June 25, 1996, upon Mr. Kimberlin's request, Ciena reissued, to Kimberlin Partners, the warrants to purchase 250,000 shares.  Following a 5-for-1 stock split in February 1997, the warrants to purchase 300,000 shares at $2 per share were converted into warrants to purchase 1,500,000 shares at an exercise price of 40 cents per share.

On February 5, 1997, Spencer Trask and Kimberlin Partners exercised all of the warrants and purchased 1,500,000 shares of Ciena series B convertible preferred stock.  Checks totaling $600,000 were paid to Ciena.  On the date of exercise, the mean selling price per share of Ciena preferred stock was $29.30.  On February 7, 1997, Ciena held its initial public offering.  The mean selling price per share of Ciena common stock on that date was $35.68.

Spencer Trask did not report, on its originally filed 1995 return, income from the receipt of warrants, nor did it report income from the exercise of the warrants on its 1997 return. In March 1998, Spencer Trask filed an amended return relating to 1995 and reported $13,500 of income relating to the receipt of the warrants. On February 16, 2005, respondent mailed a notice of deficiency to Spencer Trask. The notice of deficiency determined that, pursuant to sections 83 and 61, the warrants received by Spencer Trask resulted in $43,950,000 of taxable income in 1997 (i.e., the year the warrants were exercised).

Mr. and Mrs. Kimberlin did not report income from the receipt of warrants on their originally filed 1995 return, nor did they report, on their 1997 return, income from the exercise of the warrants. In March 1998, Mr. and Mrs. Kimberlin filed an amended tax return relating to 1995 in which they reported $76,500 of income relating to the receipt of the warrants. On September 24, 2004, respondent mailed separate notices of deficiency to Mr. and Mrs. Kimberlin. The notices of deficiency determined that in 1997 Mr. Kimberlin received a dividend from Spencer Trask of $36,625,000 relating to the exercise of warrants.

After Mr. Kimberlin received warrants pursuant to the terms of the SRA, the warrants were reissued, in accordance with Mr.

Kimberlin's request, to Kimberlin Partners.  Kimberlin Partners exercised those warrants on February 5, 1997, for 1,250,000 Ciena shares and in 1998 sold the shares.  Kimberlin Partners reported the sale of the Ciena stock on Schedule D of its 1998 Form 1065, U.S. Return of Partnership Income.  On September 24, 2004, respondent mailed to the tax matters partner of Kimberlin Partners and to each partner a notice of final partnership administrative adjustment (FPAA).  The FPAA determined that, in 1998, the partnership was entitled to an increased basis for the 1,250,000 shares of Ciena stock purchased with the warrants issued to Kimberlin Partners in 1996.

On December 27, 2004, Mr. and Mrs. Kimberlin, while residing in Greenwich, Connecticut, filed their petition with the Court seeking review of the 2004 notice of deficiency.  That same day, Kevin Kimberlin, tax matters partner for Kimberlin Partners Ltd. Partnership, filed a petition seeking review of respondent's FPAA.  At the time of the petition, the partnership maintained its principal place of business in Greenwich, Connecticut.  On May 13, 2005, Spencer Trask, whose principal place of business was New York, New York, filed its petition with the Court seeking review of the 2005 notice of deficiency.  On September 23, 2005, the Court granted the parties' joint motion to consolidate these cases.

## Discussion

I.  Applicable Law

Pursuant to section 83, the warrants are taxable as income if they were issued to Ventures "in connection with the performance of services". Sec. 83(a). Whether property is transferred in connection with the performance of services is essentially a question of fact. Bagley v. Commissioner, 85 T.C. 663, 669 (1985), affd. 806 F.2d 169 (8th Cir. 1986). Section 1.83-3(f), Income Tax Regs., provides:

> Property transferred to an employee or an independent contractor * * * in recognition of the performance of, or the refraining from performance of, services is considered transferred in connection with the performance of services within the meaning of section 83. * * * The transfer of property is subject to section 83 whether such transfer is in respect of past, present, or future services.

Ventures was prevented, by virtue of Ciena's breach, from performing services it very much wished to perform. The warrants were issued to Ventures pursuant to the SRA, and not in recognition of the performance of, or the refraining from the performance of, Ventures' past, present, or future services. Indeed, respondent stipulated that Ventures "never performed any services for Ciena". In short, the requisite connection between the issuance of the warrants and the performance of services does not exist. Thus, section 83 is inapplicable.

Respondent's contentions throughout the course of the litigation were inconsistent, confusing, and unconvincing. Initially, at trial, respondent contended that the payments made pursuant to the SRA were payments for Ventures to refrain from the performance of services, but he later contended that the payments were made pursuant to an employment contract. In his opening brief, respondent changed his position and contended that "Although Spencer Trask received a warrant to purchase 300,000 shares of Ciena Series B Stock, rather than the 150,000 shares of Series A stock specified in the liquidated damages clause, the warrants were granted <u>as a result of the triggering of the liquidated damages clause</u>." (Emphasis added.) None of these positions, however, are supported by the facts. In his reply brief, respondent continued his quest for a plausible contention. He first suggested that "the parties renegotiated a larger liquidated damages amount rather than settle a breach of contract claim", a contention squarely at odds with the plain language of the SRA. Ultimately, respondent formed a coherent, yet flimsy contention, asserting that the warrants were transferred in connection with Ventures' performance, rather than its refraining from performance, of services. In his reply brief, respondent states:

> The essential facts in this case, which support a finding that the warrants were transferred in connection with the performance of services are: (1)

there was an employment contract, the PPA, that required Ventures to perform underwriting services and required Ciena to transfer cash and warrants to Ventures for the performance of such services; (2) the sole consideration to be furnished by Ventures was investment banking services; (3) Ciena's intent was to secure the services of Ventures; (4) Ventures was available to perform the services as a placement agent at the time Ciena opted not to use its services; (5) Ventures at least engaged in preparatory work and was reimbursed $35,000 for preparation of documents related to the PPA; and (6) the warrants at issue were granted to Ventures as a result of the triggering of the liquidated damages clause contained in the employment contract.

These "essential facts" simply fail to support respondent's position. Numbers 1 through 3 merely state that a contract existed and describe the intent of the parties in performing the contract. In support of number 4 (i.e., respondent's recitation of the fact that "Ventures was available to perform the services"), respondent cites section 1.280G-1, Income Tax Regs., inapplicable regulations relating to parachute payments. Number 5, emphasizing legal fees Ventures incurred relating to the PPAs, is not a pertinent fact. Finally, number 6 returns to the specious contention respondent presented in his opening brief: that the warrants were issued as a result of the liquidated damages clause. Even if a connection was established by virtue of the warrants in the liquidated damages clauses of the PPAs, all such connections were severed by the SRA, which superseded the PPAs.

II.  Determination of the Warrants' Ascertainable Fair Market
     Value

Because section 83 is not applicable, the transferred warrants are taxable in the year of grant if they had an ascertainable fair market value at that time.  See sec. 61; sec. 1.1001-1(a), Income Tax Regs.  The fair market value of property is a question of fact and only in rare and extraordinary cases will property be considered to have no fair market value. Schulman v. Commissioner, 93 T.C. 623, 638 (1989); sec. 1.1001-1(a), Income Tax Regs.

Respondent's expert testified that the warrants for Ciena stock had no ascertainable fair market value on the date of grant.  He was not credible.  Once the Court qualified him as an expert, the performance of respondent's expert, a former ski instructor, went downhill fast.  He inaccurately stated his credentials, repeatedly contradicted himself, inappropriately relied on a colleague not disclosed in his report, and insisted that multiple errors in his report were the fault of his "editor".  His lack of analytical rigor is exemplified by the fact that he did not realize, until cross-examination, that the entirety of the supporting text he relied on in the fourth edition of a particular textbook had been deleted from the sixth and current edition.  Indeed, he conceded that two of the

textbooks upon which he relied were 6 years old and two editions out of date.

In his analysis of whether Ciena stock had an ascertainable fair market value, respondent's expert inexplicably insisted that contemporaneous arm's-length sales of Ciena series B stock (i.e., the 7,354,092 shares Ciena sold in 1994 and 1995 for $1.50 per share) were not pertinent in determining the stock's fair market value. He stated:

> I don't know if the relevant facts can show a value of $1.50 to be prudent and reasonable. It's just unclear. There's no fact pattern to suggest the $1.50 is reasonable other than there's unrelated parties transacting a negotiated price. [Emphasis added.]

When the Court later questioned whether he was "trying to determine fair market value", respondent's expert stated that fair market value could not be determined, as a certified financial analyst he was obligated to follow a "higher standard", and he attempted to determine the "intrinsic value" of the warrants. In sum, we find respondent's expert's report and testimony of no value.[4] See Parker v. Commissioner, 86 T.C. 547, 561 (1986) (opinion testimony must be weighed in the light of the

---

[4] Pursuant to sec. 7491(a), petitioners have the burden of proof unless they introduce credible evidence relating to the issue that would shift the burden to respondent. See Rule 142(a). Our conclusions, however, are based on a preponderance of the evidence, and thus the allocation of the burden of proof is immaterial. See Martin Ice Cream Co. v. Commissioner, 110 T.C. 189, 210 n.16 (1998).

demonstrated qualifications of the expert and all other evidence of value).

Petitioners' expert, founder of an economic consulting company, was credible, consistent, and highly qualified.  In determining a fair market value for the warrants, he began his analysis with a consideration of the 7,354,092 shares of series B stock Ciena sold in 1994 and 1995 for $1.50 per share.  He then applied prudent valuation techniques (i.e., focusing on venture capitalist benchmark rates of return) to arrive at a fair market value, on the date of grant, of 90 cents per share.

Accordingly, we find that there was an ascertainable fair market value for the warrants on the date of grant, the value of the warrants was includable in 1995, and respondent erred in determining a deficiency when the warrants were exercised in 1997.

## III. Warrants as Dividend Income to Mr. Kimberlin

Pursuant to section 61(a)(7), gross income includes dividends.  The term "dividend" is defined in section 316(a) as a distribution of property by a corporation to its shareholders out of its earnings and profits.  There is no requirement that the dividend be formally declared or even intended by the corporation.  Gulf Oil Corp. v. Commissioner, 89 T.C. 1010, 1028 (1987), affd. 914 F.2d 396 (3d Cir. 1990).  Any portion of a distribution which is not a dividend is applied to the adjusted

basis of the shareholder's stock, and to the extent it exceeds the adjusted basis of the stock, is treated as gain from the sale or exchange of property. Secs. 301(c)(1)-(3), 316(a).

Mr. Kimberlin received the warrants as a distribution from Spencer Trask in 1995. When a distribution is a distribution other than cash, the fair market value of the property is determined as of the date of distribution. Sec. 1.301-1(b), Income Tax Regs.; see Weigl v. Commissioner, 84 T.C. 1192, 1220-1223 (1985). Thus, the warrants Mr. Kimberlin received should be valued at the time of receipt (i.e., 1995). See sec. 1.301-1(b), Income Tax Regs. We previously determined that the warrants had an ascertainable fair market value at the time of distribution, and thus they were taxable income to Mr. Kimberlin upon their receipt in 1995.

Contentions we have not addressed are irrelevant, moot, or meritless.

To reflect the foregoing,

Decisions will be entered for petitioners.