JOHN W. MECOM, JR., AND KATSY MECOM, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 22747–91.     Filed November 3, 1993.

*Thomas E. Redding, Paul Coselli,* and *Charles Koerth,* for petitioners.

*Melanie R. Urban, Dennis M. Kelly,* and *Janet Balboni,* for respondent.

LARO, *Judge*: John W. Mecom, Jr., and Katsy Mecom petitioned this Court for a redetermination of respondent's determination of a $413,686.75 deficiency in their 1976 Federal income tax. Although Katsy Mecom is a copetitioner, for simplicity and clarity, we refer to John W. Mecom, Jr., as petitioner. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for 1976, the taxable year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After stipulations by the parties, the issues for decision are: (1) Whether the consents executed by the parties were effective to extend the period of limitation under section 6501 for assessment of a deficiency for 1976; we hold that they were; (2) whether the equitable doctrine of laches bars assessment of a deficiency for 1976; we hold that it does not; (3) whether restrictive language in the final consent bars respondent from adjusting petitioner's 1976 deductions for carryover of net operating loss (NOL) and charitable contribution; we hold that it does not; and (4) whether petitioner has shown that respondent incorrectly determined his income tax deficiency for 1976; we hold that he has not.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations and exhibits attached thereto are incorporated herein by this reference. Petitioner and Katsy Mecom are husband and wife; they resided in Houston,

Texas, at the time they filed their petition. On October 15, 1977, petitioner and Katsy Mecom filed timely their 1976 Form 1040, U.S. Individual Income Tax Return, using the status of "Married filing joint return".

On the 1976 Form 1040, petitioner reported an $861,019 NOL deduction.[1] This deduction consisted of NOL carryovers of: (1) $169,149 from the 1972 taxable year, (2) $487,387 from the 1973 taxable year, and (3) $204,483 from the 1975 taxable year. A substantial part of this NOL deduction stemmed from petitioner's ownership interest in a Louisiana partnership, the New Orleans Saints (Saints), during the 1968 through 1975 taxable years. Petitioner owned the following interests in the Saints for its taxable years ending in the calendar years shown below:

| Year | Percentage interest |
|---|---|
| 1968 | 51.33 |
| 1969 | 35.5817 |
| 1970 | 37.7235 |
| 1971 | 40.5062 |
| 1972 | 54.42 |
| 1973 | 64.637 |
| 1974 | 64.37 |
| 1975 | 64.37 |

Respondent started an examination (audit) of petitioner's 1976 taxable year in 1979. Respondent also started examining petitioner's 1973 through 1975 taxable years in 1979.[2] The two examinations were conducted separately, but simultaneously.

On March 25, 1980, in partial completion of respondent's examinations of petitioner's 1973 through 1976 taxable years, petitioner agreed to an assessment of $15,563 in additional tax for his 1976 taxable year and executed Form 870, Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment. The addi-

---

[1] The term "net operating loss (NOL) deduction" means the sum of the NOL carryovers in a given year plus the NOL carrybacks to that year. Sec. 172(a). For the year in issue, an NOL for any taxable year ending before Jan. 1, 1976, generally could be carried back 3 years and then forward 5 years. Sec. 172(b)(1)(A) and (B); see also sec. 1.172-4(a)(1)(ii), Income Tax Regs.

[2] Respondent started her examination of petitioner's 1973 and 1974 taxable years more than 3 years after the respective dates on which he filed his 1973 and 1974 Federal income tax returns. Because petitioner has not claimed that this part of respondent's examination was untimely, we assume that petitioner previously consented to extend the 3-year period of limitation under sec. 6501(a) with respect to 1973 and 1974. See sec. 6501(c)(4).

tional tax arose from respondent's adjustments to the following items reported on petitioner's 1976 Form 1040: (1) A loss passed through from Le Pavillon Hotel, another partnership in which petitioner was a partner, (2) bad debt expenses, (3) depletion and itemized deductions, and (4) an NOL deduction attributable to the carryover of losses from sources other than petitioner's ownership interest in the Saints.[3] At the time petitioner signed Form 870, the sole unagreed issue in respondent's examinations of his 1973 through 1976 taxable years concerned her adjustment to his NOL deduction attributable to the carryover of losses stemming from his ownership interest in the Saints during his 1968 through 1975 taxable years.[4]

From 1980 through February 1983, respondent examined the Saints for its taxable years ended March 31, 1968, through March 31, 1975. The examinations of petitioner's 1973 through 1976 taxable years could not be completed due to respondent's ongoing examination of the Saints; thus, respondent suspended her examinations of petitioner's 1973 through 1976 taxable years awaiting the results of the Saints' examination. Respondent notified petitioner of this action on October 8, 1980.

In connection with respondent's examinations of petitioner's 1973 through 1976 taxable years, she and petitioner executed six consents seriatim (collectively referred to as the consents) to extend the period in which she could assess tax for those years. Each of the consents is signed by petitioner and signed and dated by respondent's agent on her behalf. The first four consents contain the typed name of Robert M. McKeever (McKeever), and list him as District Director of Internal Revenue. The last two consents contain the typed name of Arturo A. Jacobs, and list him as District Director of Internal Revenue.[5] Relevant information from the consents is as follows:

---

[3] Respondent assessed this additional tax of $15,563 prior to her issuance of the notice of deficiency. Although petitioner alleged in his petition that respondent erred with respect to her determination of the items related thereto, petitioner presented no evidence at trial with respect to any of these items. Accordingly, we sustain respondent's determination with respect to the assessed amount without further discussion. Rule 142(a).

[4] Petitioner filed individual income tax returns for his 1968 through 1975 taxable years, and claimed losses for every year, except 1974, from his ownership interest in the New Orleans Saints (Saints).

[5] In 1981, the Austin District split into two districts, one in Austin and a new one in Houston.

| Taxable years | Form | Extension to | Date signed by petitioner | Date signed by respondent | Surname of respondent's signatory | Title [1] of respondent's signatory |
|---|---|---|---|---|---|---|
| 1973-76 | [2]872 | 12/31/80 | 10/11/79 | 10/15/79 | Hofer | Case manager |
| 1973-76 | 872 | 12/31/81 | 3/25/80 | 3/26/80 | Woodward | Group manager |
| 1973-76 | 872 | 12/31/82 | 10/16/81 | 11/10/81 | Field | Classifier |
| 1973-76 | 872 | 12/31/83 | [3] | 11/24/82 | Anderson | Classifier/Screener [4] |
| 1973-76 | 872 | 12/31/84 | [5] | 11/23/83 | Dodd | Classifier/Screener |
| 1973-76 | [6]872-A | Indefinite | 9/14/84 | 10/12/84 | Miggins | Classifier/Screener |

[1] These are the titles that appeared on the forms next to each signatory's name.

[2] Consent to Extend the Time to Assess Tax.

[3] Petitioner signed this Form 872 on or before the date signed by respondent. This form contains a stamp mark showing that respondent's "RPM/918-A" division in the Austin District received the form back from petitioner on Nov. 23, 1982.

[4] Classifiers and screeners perform different, but related, functions. The same person usually holds both positions.

[5] Petitioner signed this Form 872 on or before the date signed by respondent. This Form contains a stamp mark showing that respondent's "RPM/ESS" division in the Houston District received the form back from petitioner on Nov. 22, 1983.

[6] Special Consent to Extend the Time to Assess Tax.

As shown above, Hofer's title was case manager at the time he signed the first consent on behalf of respondent. Hofer's title previously was group manager. The duties and responsibilities of a case manager are substantially the same as the duties and responsibilities of a group manager; both are intermediate-level managers who are responsible for protecting the expiration of the period of limitation for cases within their group. The primary difference between the two positions is that case managers supervise revenue agents who concentrate on the examinations of "large taxpayers", and group managers supervise revenue agents who examine a wider range of taxpayers.[6]

As also shown above, Field signed the third consent.[7] On the date that he signed this consent, Field was a GS-11 in the Southwest Region, and was working as a temporary

All functions in the Austin District did not move immediately to the Houston District; one of the last to move was Returns Program Management. For some time after the split, consents continued to be signed under the authority of the Austin District delegation orders. We assume that Robert M. McKeever (McKeever) was the District Director of Austin, and Arturo A. Jacobs was the District Director of Houston.

[6] The title "group manager" was loosely used in the Southwest Region, the region in which Hofer was employed, to include all managers of groups of examiners (e.g., case managers). During the year at issue, case managers routinely signed consents to extend the time to assess tax.

[7] Respondent mailed petitioner a letter dated Nov. 10, 1981, signed by McKeever, and enclosed a copy of the Form 872 signed by Field. In relevant part, the letter read: "Enclosed is a copy of the above consent for your records. It extends to the date shown the time in which we may assess tax for this period."

replacement of the 918-A coordinator for returns program management (RPM). As a 918-A coordinator, Field was performing the duties of a classifier.

RPM is an activity within the Examination Division, and the position of 918-A coordinator is a subtitle used to identify an examination program coordinator for this specific program. Prior to June 30, 1980, the organizational title in the Southwest region for an "examination program coordinator" was "returns classifier". Following that date, the positions of "examination program coordinator" and "returns classifier" had similar job descriptions, and the same duties, responsibilities, and authority. In addition, in the Southwest Region, the title "examination program coordinator" was merely another name for a "classifier".[8]

With respect to the sixth consent, Form 872-A, respondent mailed the form to petitioner's home address with a transmittal letter dated September 11, 1984. The transmittal letter did not indicate that copies were mailed to any other person. At the time of mailing, A.T. Blackshear, Jr. (Blackshear), was petitioner's authorized representative for his 1973 through 1975 examination.[9] At the time Form 872-A was signed by the parties, Form 872-A contained "restrictive language" providing in relevant part that

The amount of any deficiency assessment is limited to that resulting from any adjustment to: (a) the distributive share of any item of income, gain, loss, deduction, or credit of, or distribution from any partnership * * *; (c) the distributive share of any item of income, gain, loss, deduction, or credit of, or distribution from any Sub Chapter [sic] S corporation * * * (e) any carryover or continuing tax effects caused by adjustments to any prior taxable year or period; and (f) any consequential changes to other items based upon such adjustments.

Petitioner received professional advice concerning, and prior to signing, Form 872-A.

On February 3, 1983, petitioner, in his capacity as the Saints' general partner, executed two Forms 875, Acceptance of Examining Officer's Findings by a Partnership, Fiduciary,

---

[8] The change in title on June 30, 1980, was made to reflect the development of specific program controls, and not to modify an existing position or create a new position. According to a memorandum from the assistant regional commissioner of examination for the Southwest Region, the change reflected a change in the organizational title of the position of "classifier".

[9] The record does not indicate whether Blackshear or any other person was authorized to represent petitioner with respect to the 1976 taxable year at the time respondent mailed Form 872-A to petitioner.

or Small Business Corporation, for the Saints' taxable years under examination. These Forms 875 represented the settlement of the Saints' examination; these forms accepted certain adjustments to "ordinary, distributable net, or taxable income".[10] Amortization expense was the primary item adjusted by respondent and agreed to by petitioner on behalf of the Saints. Petitioner executed the Forms 875 upon advice of counsel; among other things, counsel explained the consequences of the forms to petitioner.[11]

In November 1987, Terry Eldred (Eldred), a third revenue agent of respondent, was assigned petitioner's 1973 through 1976 taxable years to: (1) Redetermine petitioner's tax liability for those years taking into account the agreed results of the Saints' examination, and (2) process revenue agent reports. Eldred's calculations resulted in a tax deficiency for 1976, and no tax deficiencies for 1973, 1974, or 1975.

At or about the same time as Eldred's assignment, respondent was reviewing petitioner's claims for refund for his 1979 through 1986 taxable years in her Joint Committee Survey Group.[12] Petitioner asked respondent to close her examination of his 1973 through 1976 taxable years simultaneously with her review of his 1979 through 1986 taxable years; petitioner wanted to offset any deficiencies with overassessments for the respective years.[13] Respondent

---

[10] Respondent's adjustments appeared on Forms 875 in a column entitled "AMOUNT OF INCREASE OR (DECREASE)"; Forms 875 specifically provided: "The adjustment changes the amount of income, as shown above". The distributable net income/(loss) reported by the Saints, respondent's adjustments to those amounts, and the Saints' adjusted net income/(loss) were as follows:

| Year | Reported | Adjustments | Corrected |
|---|---|---|---|
| 3/31/68 | ($2,571,412.89) | $820,805.04 | ($1,750,607.85) |
| 3/31/69 | (735,288.00) | 734,789.19 | (498.81) |
| 3/31/70 | (1,285,869.00) | 649,007.40 | (636,891.60) |
| 3/31/71 | (380,972.30) | (400,479.66) | (781,451.96) |
| 3/31/72 | 34,134.00 | 546,924.37 | 581,058.37 |
| 3/31/73 | (110,419.00) | 551,616.00 | 441,197.00 |
| 3/31/74 | 21,389.00 | 550,204.00 | 571,593.00 |
| 3/31/75 | (1,432,660.00) | 564,163.00 | (868,497.00) |

[11] From 1968 through the completion of trial, petitioner regularly consulted and was represented by counsel and/or certified public accountants.

[12] Petitioner previously filed claims for refunds for his 1979 through 1986 taxable years, and these claims were in excess of $200,000. In the case of refunds in excess of $200,000, respondent was generally required to prepare and furnish a report to the Congressional Joint Committee on Internal Revenue Taxation before making any refund. See sec. 6405(a).

[13] On Mar. 19, 1990, petitioner signed a Form 870, Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment, for his 1979 through 1987 taxable years. The Form reflected a net overassessment of $1,042,834.

attempted to accommodate petitioner's request, but was unable to do so.

In May 1989, Eldred transferred petitioner's 1976 taxable year to respondent's review staff for issuance of a 30-day letter; the year was processed, a 30-day letter was issued, and the year went to respondent's Appeals Office (Appeals) pursuant to petitioner's protest. From early 1990 until July 1991, Appeals unsuccessfully tried to resolve petitioner's 1976 taxable year; Appeals closed the case in July 1991 after issuing a notice of deficiency. Prior to the issuance of this notice, respondent did not send to or receive from petitioner a Form 872-T, Notice of Termination of Special Consent to Extend the Time to Assess Tax, for petitioner's 1976 taxable year.

In her notice of deficiency, respondent determined that petitioner had an NOL deduction for the 1976 taxable year of $125,894, generated entirely from an NOL carryover from 1973. Respondent determined petitioner's NOL deduction by: (1) Adjusting his allocable share of the Saints' net income or loss based on the results of the Saints' examination, and (2) using these adjustments to adjust petitioner's taxable income for each of the taxable years 1968 through 1975 solely to revise his NOL carryovers and arrive at his 1976 NOL deduction.

OPINION

1. *Whether the Period of Limitation Under Section 6501 Bars Assessment of Any Deficiency for 1976*

Respondent generally must assess tax against an individual taxpayer such as petitioner within 3 years after the later of the due date or filing date of his or her return. Sec. 6501(a) and (b)(1); *Centennial Sav. Bank FSB v. United States,* 887 F.2d 595, 598 (5th Cir. 1989), affd. in part and revd. in part on other grounds 499 U.S. 573 (1991). As one exception to this general rule, a taxpayer and the Secretary of the Treasury (or his delegate) may agree in writing to an assessment after this 3-year period if they do so within the 3-year period (or longer period if the 3-year period was properly extended). Secs. 6501(c)(4), 7701(a)(11)(B); *Centennial Sav. Bank FSB v. United States, supra* at 598; see also sec. 301.6501(c)-1(d), Proced. & Admin. Regs. For this purpose,

the Secretary's delegate means "any officer, employee, or agency of the Treasury Department duly authorized by the Secretary * * * directly, or indirectly by one or more redelegations of authority". Sec. 7701(a)(12)(A)(i).

Petitioner contends that respondent mailed her notice of deficiency for 1976 after the expiration of the 3-year period of limitation in section 6501(a). The bar of the statutory period of limitation is an affirmative defense, and the party raising this defense must specifically plead it and prove it. Rules 39, 142(a); *Amesbury Apartments, Ltd. v. Commissioner*, 95 T.C. 227, 240 (1990). Petitioner has pleaded the defense properly; thus, we proceed to address his contention.

In questioning the validity of the notice of deficiency by asserting that the notice was mailed after the expiration of the 3-year period of limitation, petitioner initially must prove: (1) The filing date of his 1976 tax return and (2) that respondent mailed her notice of deficiency after the 3-year expiration date for the period of limitation. *Amesbury Apartments, Ltd. v. Commissioner, supra* at 240-241; *Adler v. Commissioner*, 85 T.C. 535, 540 (1985). Respondent concedes on brief that petitioner has proven both prongs.[14] Thus, petitioner has established a prima facie case that the statutory period of limitation precludes respondent from making any assessment for 1976, and the burden of going forward shifts to respondent. *J.H. Rutter Rex Manufacturing Co. v. Commissioner*, 853 F.2d 1275, 1281 (5th Cir. 1988), affg. in part and revg. in part T.C. Memo. 1987-296; *Armes v. Commissioner*, 448 F.2d 972, 974 (5th Cir. 1971), affg. in part, revg. in part, and remanding T.C. Memo. 1969-181; *Adler v. Commissioner, supra* at 540-541. Respondent must show that an assessment for 1976 is not barred by the period of limitation under section 6501(a). *Armes v. Commissioner, supra* at 974; *Adler v. Commissioner, supra* at 540-541.

Respondent may meet her burden by showing that: (1) She and petitioner executed one or more written agreements, valid on their face, extending the period of limitation on assessment, and (2) the notice of deficiency was mailed prior

---

[14] We agree. Petitioner filed his 1976 Federal income tax return on Oct. 15, 1977, and the 3-year period of limitation under sec. 6501(a) expired on Oct. 15, 1980. Because respondent issued her notice of deficiency on June 11, 1991, i.e., more than 3 years after petitioner filed his 1976 return, the period of limitation under sec. 6501(a) bars assessment of any deficiency contained in respondent's notice except to the extent that petitioner agreed to an extension under sec. 6501(c)(4).

to the end of the extended period.[15] *J.H. Rutter Rex Manufacturing Co. v. Commissioner, supra* at 1281; *Adler v. Commissioner, supra* at 540. If respondent makes such a showing, the burden of going forward with the evidence shifts back to petitioner to prove the invalidity of any of the consents.[16] *J.H. Rutter Rex Manufacturing Co. v. Commissioner, supra* at 1281; *Adler v. Commissioner, supra* at 541.

The record shows that respondent has met her burden. First, the consents were admitted into evidence as jointly stipulated exhibits. Second, all the consents were drafted legibly, and included all the required information (i.e., name and address of the taxpayer, type of tax involved, tax years at issue, and the expiration date of the extension). Third, all the consents were signed by petitioner and an agent of respondent; the agent's title and date of signature were also noted. Fourth, the first consent was executed prior to the expiration of the 3-year period of limitation contained in section 6501(a), and each consent thereafter was executed prior to the expiration of the extended period contained in the consent executed immediately before it. Fifth, the notice of deficiency was mailed to petitioner prior to the end of the extended period contained in the final consent. The burden of going forward with the evidence now shifts back to petitioner to prove the invalidity of any of the consents.

Petitioner generally contends that Form 872-A was insufficient to extend the period of limitation with respect to respondent's adjustments. In this regard, petitioner contends, Form 872-A was invalid to extend the period of limitation indefinitely because: (1) The parties did not mutually assent to the same scope of the agreement when they executed Form 872-A, (2) Form 872-A was mailed to petitioner and not to his authorized representative, and (3) a proper party did not sign the first and third consents on behalf of respondent.

---

[15] Respondent published the following two forms for taxpayers to use to consent to extend the time in which she could assess tax for a given year: (1) Form 872, Consent to Extend the Time to Assess Tax, which was used to extend the period of limitation to a date certain, and (2) Form 872-A, Special Consent to Extend the Time to Assess Tax, which was used to extend the time to assess tax indefinitely.

[16] Notwithstanding the shifting of the burden of going forward, the burden of ultimate persuasion never shifts from the party who pleads the bar of the statutory period of limitation. *Stern Bros. & Co. v. Burnet,* 51 F.2d 1042 (8th Cir. 1931), affg. 17 B.T.A. 848 (1929); *Amesbury Apartments, Ltd. v. Commissioner,* 95 T.C. 227, 241 (1990); *Adler v. Commissioner,* 85 T.C. 535, 540 (1985); see also Rule 142(a); *Kronish v. Commissioner,* 90 T.C. 684, 692-693 (1988) (ultimate burden of proving that the notice of deficiency was untimely, and therefore invalid, rests with petitioner).

We turn to petitioner's contentions and address them one at a time.

a. *Mutual Assent*

It is well settled that an agreement to extend the 3-year period of limitation under section 6501(a) is not a contract but a unilateral waiver of a defense by the taxpayer. *Stange v. United States,* 282 U.S. 270, 276 (1931); *Schulman v. Commissioner,* 93 T.C. 623, 639 (1989); *Kronish v. Commissioner,* 90 T.C. 684, 693 (1988); *Tallal v. Commissioner,* 77 T.C. 1291, 1294 (1981), affd. on other issues 778 F.2d 275 (5th Cir. 1985). Contract principles are pivotal, however, in determining the existence and scope of that agreement because section 6501(c)(4) requires a written agreement. *Schulman v. Commissioner, supra* at 639; *Piarulle v. Commissioner,* 80 T.C. 1035, 1042 (1983). The parties are free to decide the terms governing their agreement to extend the period of limitation under section 6501. *Pursell v. Commissioner,* 38 T.C. 263, 278 (1962), affd. 315 F.2d 629 (3d Cir. 1963). The parties' terms are determined from their objective manifestations of mutual assent. *Amesbury Apartments, Ltd. v. Commissioner,* 95 T.C. 227, 240 (1990); *Kronish v. Commissioner, supra* at 693; *Piarulle v. Commissioner, supra* at 1042.

Petitioner argues that Form 872-A is not a valid agreement between him and respondent because there was not a meeting of their minds at the time he signed the form. In other words, petitioner contends, at the time he signed Form 872-A, he believed that Forms 875 reflected increased amortization adjustments (and, hence, decreased income) and, consequently, were favorable to the Saints and to him. In his mind, therefore, he was not executing a consent that would allow respondent to assess unfavorable items from the Saints' audit, but was executing an extension that merely allowed respondent to make the favorable adjustments from the Saints' examination and/or any adjustments from other flow-through entities with respect to transactions that occurred in 1975 or 1976. If and to the extent that respondent intended or believed otherwise, petitioner concludes, the parties lacked a meeting of the minds and, accordingly, Form 872-A is invalid.

We disagree with petitioner. Petitioner's private intentions are not determinative of whether the parties entered into an agreement; instead, we look to the objective manifestation of mutual assent as evidenced by the parties' overt acts. *Kronish v. Commissioner, supra* at 693 (citing 1 Williston, Contracts, secs. 22, 35 (3d ed. 1957) and 1 Restatement, Contracts 2d, sec. 19 (1979)). Petitioner's assent to the terms inscribed in Form 872-A is seen clearly by his signature on Form 872-A. *Id.*

Petitioner executed the Forms 875 upon advice of counsel, and counsel explained the consequences of the Forms to him. Taking into account that the numbers at issue on the Forms 875 appear in a column entitled "AMOUNT OF INCREASE OR (DECREASE)" and that Forms 875 specifically state: "The adjustment changes the amount of income, as shown above", we find it hard to believe that none of these representatives explained to petitioner (and he did not know) the significance of the adjustments reflected on the forms.

Petitioner relies on *Bower v. Commissioner,* T.C. Memo. 1992-446, and *Hicks v. Commissioner,* T.C. Memo. 1991-564, to support his aberrational proposition that there was no mutual assent because he believed he was signing a "favorable" document. Petitioner's reliance on these cases is misplaced; they do not stand for the unique proposition that he asserts. In *Bower,* the Commissioner and the taxpayers executed a restricted Form 872 that contained language which the Court found to be ambiguous. The Court then allowed the taxpayers to admit extrinsic evidence to clarify the meaning of the ambiguous language in the Form. In the instant case, by contrast, the consents are not ambiguous. The record is also barren of any clear documentation showing that petitioner and respondent had different understandings of the scope of the "restrictive language" in the Form 872-A (quoted *supra* p. 379).[17] In *Hicks,* the Commissioner mailed

---

[17] Although petitioner testified at trial, nothing in his testimony supports clearly his alleged intent or understanding of the scope of the restrictive language in Form 872-A. Petitioner could have solicited testimony from Katsy Mecom, who also signed Form 872-A, or Ernie Danner, who advised petitioner on the scope of the agreement. Petitioner chose not to do so. We can only assume that if petitioner had called these two persons as witnesses, their testimony would have been unfavorable to him. *Pollack v. Commissioner,* 47 T.C. 92, 108 (1966), affd. 392 F.2d 409 (5th Cir. 1968); *Wichita Terminal Elevator Co. v. Commissioner,* 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947); see also *McKay v. Commissioner,* 89 T.C. 1063, 1069 (1987), affd. 886 F.2d 1237 (9th Cir. 1989) (failure of witness to testify to fact peculiarly within his knowl-

the taxpayers an unrestricted Form 872 and, in the accompanying transmittal letter, stated that she was limiting her examination to a certain issue. The Commissioner subsequently conceded the issue referred to in the transmittal memorandum, expanded her examination to other issues, and determined a deficiency with respect to these other issues. The Court found that the Form 872 was invalid due to a lack of mutual assent. As contrasted with the case at hand, however, the transmittal letter in *Hicks* showed the Commissioner's intent to limit the scope of her examination to an issue different from the one which ultimately gave rise to the assertion of a deficiency.[18]

### b. *Form 872-A Mailed to Petitioner*

Petitioner argues that the sixth consent, Form 872-A, was insufficient to extend the 3-year period of limitation under section 6501(a) because it was mailed to him directly rather than to his authorized representative. In this regard, petitioner alleges, Blackshear was his authorized representative for 1976 pursuant to a power of attorney, and Blackshear was not informed of respondent's request to extend the limitation period beyond the extension period contained in the fifth consent.

We reject petitioner's argument. Petitioner has not proven that Blackshear was his authorized representative for his 1976 taxable year at the time respondent mailed Form 872-A to him. Petitioner also did not call Blackshear to testify at trial; thus, we do not know what Blackshear knew or did not know with respect to Form 872-A. We can only assume that if petitioner had called Blackshear, his testimony would have been favorable to respondent and would not have supported petitioner's allegations. *Pollack v. Commissioner,* 47 T.C. 92, 108 (1966), affd. 392 F.2d 409 (5th Cir. 1968); *Wichita Terminal Elevator Co. v. Commissioner,* 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).

Assuming arguendo that petitioner had authorized Blackshear to act on his behalf with respect to Form 872-A,

edge suggests that testimony would have been unfavorable to him).

[18] See also *Kronish v. Commissioner,* 90 T.C. 684 (1988); *Tallal v. Commissioner,* 77 T.C. 1291, 1293 (1981), affd. on other grounds 778 F.2d 275 (5th Cir. 1985) (consents were valid and/or unrestricted where taxpayers executed them believing the consents were conditioned upon an event which had or would occur; taxpayers failed to memorialize their understanding in a writing associated with the consents).

we would still hold for respondent. Petitioner was able to (and did) obtain professional advice concerning Form 872-A before signing it, and we see nothing that precluded petitioner from knowingly and intelligently acting in his own behalf. In addition, respondent generally is not required to mail Form 872-A to anyone other than the taxpayer. *J.H. Rutter Rex Manufacturing Co. v. Commissioner,* 853 F.2d 1275, 1282 (5th Cir. 1988), affg. in part and revg. in part T.C. Memo. 1987-296; *Neuhoff v. Commissioner,* 75 T.C. 36, 42-43 (1980), affd. 669 F.2d 291 (5th Cir. 1982). This is not to say that, in certain cases, respondent would not abuse her authority by dealing directly with a taxpayer whom she knows is represented by an authorized representative. In such a case, a naive taxpayer may execute a document tendered by respondent which is contrary to his or her interests because an authorized representative is not consulted. The facts of the instant case, however, do not reflect such abuse; petitioner has not claimed that respondent acquired his signature by inappropriate means such as duress, undue influence, deception, or fraud.

## c. *Respondent's Signatories*

Petitioner contends that Form 872-A is invalid because an authorized delegate of respondent did not sign the first or third consents executed by the parties on Form 872, and a valid first and third consent were required to validate Form 872-A. Once again, we disagree with petitioner's contention. We conclude that authorized delegates of respondent did sign the first and third consents executed by the parties on Form 872.

The authority to execute Form 872 on behalf of the Secretary was originally delegated to the Commissioner of Internal Revenue. Treasury Department Order Nos. 120 and 150-2.[19] With respect to the first consent, Delegation Order No. 42 (Rev. 12), 1979-2 C.B. 482 (effective May 24, 1979), contained the list of positions that were delegated authority from the Commissioner to sign consent forms. This delegation order allowed consent forms to be executed by certain directors, such as District Directors, and empowered these

---

[19] See generally *Stamos v. Commissioner,* 95 T.C. 624, 629-634 (1990), affd. without published opinion 956 F.2d 1168 (9th Cir. 1992) (discussion of Treasury Department Orders, including Nos. 120 and 150-2).

directors to redelegate their authority to certain lower positions in the Examination Division, including reviewers, grade GS-11; group managers; case managers; and returns program managers. The Austin District Director explicitly delegated his authority to certain positions in his district, including "the incumbents of, and any persons acting in, the positions" of group managers in the Examination Division. Austin Delegation Order No. 55 (Rev. 1) (effective Mar. 28, 1979).

Although the Austin Delegation Order did not specifically list the title "case manager" as a permissible delegate, we find that the order was sufficient to delegate signatory authority to case managers, and in that capacity Hofer properly signed the first consent on behalf of respondent. Hofer was formerly a group manager supervising revenue agents who examined various taxpayers; at the time he signed Form 872, however, Hofer had advanced to the title of case manager and supervised revenue agents who examined large taxpayers. The positions of "case manager" and "group manager" are similar for present purposes. Both positions are held by supervisors, who are assigned responsibility for seeing that the period of limitation for cases within their group is kept open, and who are called on to sign consents extending the time to assess tax in carrying out their responsibility. Further, the title "group manager" was used in the Southwest Region, the region in which Hofer was employed, to include case managers. Thus, the Austin District Director delegated consent-signing authority to both group managers and case managers when he issued Austin Delegation Order No. 55 (Rev. 1) (effective Mar. 28, 1979).

Even apart from the District Director's written delegation, we find that Hofer had authority to sign the consent. See *Sanderling, Inc. v. Commissioner,* 66 T.C. 743, 753-755 (1976) (oral delegation of authority is sufficient), affd. on this issue 571 F.2d 174 (3d Cir. 1978); *Wessel v. Commissioner,* 65 T.C. 273, 276 (1975). Case managers such as Hofer regularly executed consent agreements extending the period of limitation for cases within their group, and public officials are presumed to have properly discharged their official duties. See, e.g., *R.H. Stearns Co. v. United States,* 291 U.S. 54, 63 (1934) (official acts entitled to presumption of regularity that all required prerequisites have been complied with, and such duties have been properly discharged); *United*

*States v. Chemical Found., Inc.*, 272 U.S. 1, 14-15 (1926) (presumption is that public officials discharged their official duties properly, absent clear evidence to the contrary). In this regard, petitioner failed to show that Hofer was not discharging properly his assigned duties.

Notwithstanding the propriety of Hofer's signature on Form 872, the first consent was not necessary to extend the period of limitation under section 6501(a) for petitioner's 1976 tax year. The 3-year period of limitation expired on October 15, 1980, and the second consent was executed by a group manager on March 26, 1980. Thus, to the extent that the first consent was insufficient to extend the statutory period of limitation, the second consent saved the limitation period from expiring.

Petitioner argues that, assuming the first consent was invalid, the second consent was also invalid because, at the time of the second consent's execution, the 3-year period of limitation under section 6501(a) had expired on 3 of the 4 years covered by the second consent. We disagree that the second consent was invalid. First, petitioner has not proven that the period of limitation had expired on his 1973 through 1975 taxable years, the other 3 years covered by the second consent. Second, although the second consent was one form that covered 4 years, the form constituted a separate waiver for each year. See, e.g., *Greylock Mills v. Commissioner*, 31 F.2d 655, 657 (2d Cir. 1929), affg. 9 B.T.A. 1281 (1928); *Revere Copper & Brass, Inc. v. United States*, 77 Ct. Cl. 456, 462-463, 3 F. Supp. 157 (1933). Thus, the period of limitation was open on petitioner's 1976 taxable year at the time the second consent was signed. *Piarulle v. Commissioner*, 80 T.C. 1035 (1983), the case cited by petitioner to support his contrary proposition, is easily distinguishable on its facts and does not merit further discussion.

Petitioner also challenges the validity of the third consent arguing that Field did not have the required authority to sign the consent on behalf of respondent. Again, we disagree.

Delegation Order No. 42 (Rev. 14), 46 Fed. Reg. 40969 (Aug. 13, 1981) (effective Aug. 10, 1981), allowed consent forms to be executed by certain directors, such as District Directors, and empowered these directors to redelegate their authority to certain lower positions in the Examination Division, including reviewers, Grade GS-11; group managers;

case managers; returns program managers; and classifiers/ screeners, Grade GS-11. The Austin District Director delegated his authority to certain positions in the Examination Division of his district, including "the incumbents of, and any persons acting in, the positions" of group managers; case managers; returns program managers; classifiers/screeners, GS-11 and above; and reviewers, GS-11 and above. Austin Delegation Order No. 55 (Rev. 4) (effective Oct. 7, 1981).

At the time he signed the third consent, Field was temporarily detailed as an examination program coordinator. Notwithstanding that the delegation orders from the Commissioner and the Austin District Director identified one of the authorized positions as "classifier/screeners", and did not mention "examination program coordinators", the "classifier's" organizational title in the Southwest Region, the region in which Field was employed, was "examination program coordinator". Where different titles are used to describe the same position, persons holding either title are delegated the necessary authority to sign consents. See, e.g., *Cindrich v. Commissioner,* T.C. Memo. 1984-294 (although "group managers" and not "group supervisors" were delegated authority to sign Forms 872, "group supervisors" were also authorized to sign forms because the different titles described the same position). Although Field was temporarily acting (rather than permanently employed) in this position, the Austin Delegation Order explicitly conferred authority to "persons acting in" authorized positions. In addition, a person acting in a temporary position assumes and possesses all the authority vested in, or delegated to, that position. *Estate of Brimm v. Commissioner,* 70 T.C. 15, 21 (1978); see also *Sanderling, Inc. v. Commissioner,* 66 T.C. 743, 753-755 (1976), affd. on other issue 571 F.2d 174 (3d Cir. 1978); *Wessel v. Commissioner,* 65 T.C. 273, 276 (1975). We also note that the transmittal letter accompanying the Form 872 mailed to petitioner was signed by McKeever, the Director of the Austin District. Accordingly, we conclude that Field possessed the authority of a "classifier", within the meaning of the Austin Delegation Order, at the time he signed the third consent, and his signature was proper.

## 2. *Whether the Equitable Doctrine of Laches Bars Assessment of Any Deficiency for 1976*

The doctrine of laches is an equitable remedy that is based on the injustice that could result from the enforcement of long-neglected rights; on the difficulty, if not the impossibility of determining the truth of the underlying controversy and reaching justice between the parties; and on the basis of public policy, its aim being the discouragement, for the peace and tranquility of society, of stale and outdated claims. *Southern Pac. Transp. Co. v. Commissioner,* 75 T.C. 497, 840 (1980). The application of this equitable doctrine is not determined solely by the mere passage of time, but is left to the discretion of the presiding court based on the particular facts and circumstances of the case. *Shaffer v. Rector Well Equip. Co.,* 155 F.2d 344, 345-346 (5th Cir. 1946); see also *Gardner v. Panama R.R.,* 342 U.S. 29, 30-31 (1951). In deciding whether or not to exercise its discretion in a particular case, courts usually look for: (1) Inexcusable delay or lack of diligence in asserting a claim by the party against whom the doctrine is to be applied, and (2) prejudice to the other party caused by reliance on his or her opponent's conduct. *Costello v. United States,* 365 U.S. 265, 282 (1961); *Southern Pac. Transp. Co. v. Commissioner, supra* at 840.

In the instant case, petitioner argues that the doctrine of laches operates to bar assessment of any tax for his 1976 taxable year because respondent issued her notice of deficiency for 1976 almost 7 years after he signed Form 872-A, and almost 14 years after he filed his 1976 tax return. In other words, petitioner argues, the Court should write into Form 872-A an additional term under which the agreement terminates after the expiration of a certain period of time following its execution.

We refuse to write such a term into the parties' agreement; Form 872-A was not terminated by operation of law after the passage of the time periods involved here. *Wall v. Commissioner,* 875 F.2d 812, 813 (10th Cir. 1989), affg. an oral opinion of this Court; *Tapper v. Commissioner,* 766 F.2d 401, 404 (9th Cir. 1985), affg. per curiam an order of this Court; *Estate of Camara v. Commissioner,* 91 T.C. 957 (1988); *Grunwald v. Commissioner,* 86 T.C. 85, 89-90 (1986). Form 872-A was an agreement that the parties voluntarily entered

into to extend the period of limitation indefinitely. See sec. 6501(c)(4). By its express terms, Form 872-A would only have terminated after: (1) The office of respondent that was considering the case received a Form 872-T from petitioner, (2) respondent mailed a Form 872-T to petitioner, (3) respondent issued a notice of deficiency to petitioner, or (4) respondent assessed tax covered by the agreement, and that assessment reflected her final determination of tax and her final administrative Appeals consideration.

The power to terminate the extension of the period of limitation contained in Form 872-A was within petitioner's control continually; at any time, he easily could have mailed respondent a Form 872-T. He chose not to do so. We need not consider petitioner's reasons for not mailing respondent a Form 872-T; he made his decision voluntarily and intentionally, and he must now live with the benefits and detriments of his decision. As previously stated by this Court in *Grunwald v. Commissioner, supra* at 89, "A deal is after all a deal, and fairness dictates that both parties adhere to the provisions of the document they both voluntarily signed."[20]

### 3. *Whether Respondent May Adjust Petitioner's 1976 NOL Deduction*

Having concluded that the consents were valid to extend the period of limitation under section 6501, and that the equitable doctrine of laches does not prevent respondent from assessing tax for petitioner's 1976 taxable year, we turn to decide whether respondent's adjustment to petitioner's NOL deduction was within the restricted language of Form 872-A.

It is well-settled law that the Commissioner may examine barred years for the purpose of redetermining the NOL deduction for a current year. See, e.g., *Leitgen v. Commissioner,* 691 F.2d 504 (8th Cir. 1982), affg. without published opinion T.C. Memo. 1981-525; *Pacific Transp. Co. v. Commissioner,* 483 F.2d 209, 214-215 (9th Cir. 1973), vacating and remand-

---

[20] Contrary to petitioner's allegations on brief, we are not persuaded that respondent was dilatory in issuing her notice of deficiency almost 14 years after he filed his 1976 tax return. The examination of petitioner's 1976 return involved complex issues, and respondent was simultaneously examining many of petitioner's prior years to determine any NOL carryovers to 1976. Respondent was also simultaneously conducting an examination of the Saints, the outcome of which substantially affected petitioner's 1976 return. In addition, petitioner contributed to the delay by asking respondent to close his 1976 year contemporaneously with other years to offset his refunds and deficiencies.

ing T.C. Memo. 1970-41; *Hill v. Commissioner,* 95 T.C. 437, 439-440 (1990); *Lone Manor Farms, Inc. v. Commissioner,* 61 T.C. 436, 440-441 (1974), affd. without published opinion 510 F.2d 970 (3d Cir. 1975); *ABKCO Indus., Inc. v. Commissioner,* 56 T.C. 1083, 1089 (1971), affd. on other grounds 482 F.2d 150 (3d Cir. 1973); see also sec. 6214(b) (the Court may redetermine a deficiency in a given year by considering facts related to taxes in other years). Such a redetermination of taxable income in a prior closed year is allowed solely for the purpose of determining the correct taxable income in a current year. Sec. 6214(b). Accordingly, respondent may assess tax with respect to petitioner's 1976 NOL deduction (and adjust his pre-1976 income for the purpose of determining this NOL deduction), if and to the extent that she is not precluded by the period of limitation under section 6501 applicable to 1976.

Respondent argues that her adjustment to petitioner's 1976 NOL deduction was not statutorily barred because it fell squarely within the scope of clause (e) of the restrictive language of Form 872-A.[21] Petitioner counters that this restrictive language precluded respondent from adjusting his 1976 NOL deduction because the language did not provide that respondent could make adjustments to closed taxable years.[22] In this regard, petitioner argues, respondent agreed to restrict her ability to make adjustments to his prior years because the parties believed that the adjustments in the Forms 875 were "favorable" to him.[23]

Although we agree with petitioner that respondent may not adjust his NOL deduction to the extent that he did not

---

[21] This clause provided that "The amount of any deficiency assessment is limited to that resulting from any adjustment to: * * * (e) any carryover or continuing tax effects caused by adjustments to any prior taxable year or period".

[22] Petitioner generally contends that the restrictive language on Form 872-A limited respondent's adjustments to flow-through items appearing on his 1975 and 1976 tax returns. We reject this contention; the restrictive language in clause (e) of Form 872-A was not drafted narrowly to apply to any "carryover to 1976 caused by adjustments to 1975"; it was drafted broadly to encompass carryovers caused by adjustments to *any* prior year. In connection therewith, clauses (a) and (c) of Form 872-A allowed respondent to adjust petitioner's distributive shares of items from any partnerships and subchapter S corporations for the 1975 and 1976 taxable years.

[23] We find this part of petitioner's argument hard to believe. Petitioner was well advised before he signed the Forms 875, and the forms show clearly that most of the listed amounts are increases to income. In addition, we doubt that respondent would have misconstrued these amounts as decreases in income, or would have limited her ability to assess these amounts. Assuming arguendo that petitioner believed that the amounts on Forms 875 were favorable, we are also unable to hypothesize why petitioner would have agreed not to pursue his large share of these favorable adjustments which aggregated over $4 million.

extend the period of limitation with respect to that item, sec. 6501(a), (c)(4), we disagree with him as to the scope of the restrictive language in Form 872-A. In clause (e) of Form 872-A, petitioner extended the limitation period with respect to "*any* carryover * * * caused by adjustments to any prior taxable year". (Emphasis added.) Thus, adjustments to petitioner's 1976 NOL deduction, including adjustments to *any* prior taxable year necessary to compute the NOL carryover portion of the NOL deduction, were within the explicit terms of Form 872-A.

Petitioner asks the Court to add the word "timely" to the restrictive language in Form 872-A to modify the word "adjustment". In other words, petitioner contends, respondent should not be allowed to adjust any amount that is carried over to 1976 from a prior closed year. We refuse petitioner's invitation to make such an interpretation; the unambiguous language of Form 872-A does not modify the word "adjustment" with the word "timely" or any other limiting adjective.

We interpret the term "adjustment" based on the parties' intent, as evidenced clearly by the restrictive language in Form 872-A, and on the plain meaning of the term "adjustment", *Constitution Publishing Co. v. Commissioner,* 22 B.T.A 426, 428-429 (1931); an "adjustment" is "a correction or modification to reflect actual conditions", Webster's Ninth New Collegiate Dictionary (1990). Accordingly, under the terms of Form 872-A, we allow respondent to correct or modify (to reflect actual conditions) any prior year of petitioner for the sole purpose of determining his 1976 NOL deduction. To conclude otherwise would be to allow petitioner to repudiate the consequences that he voluntarily assumed when he agreed with respondent to extend the period of limitation under section 6501(a).[24]

In support of his interpretation of the restrictive language in Form 872-A, petitioner relies primarily on *Powell v. Commissioner,* T.C. Memo. 1990-329. Although *Powell* involved the same restrictive language as the case at hand,

---

[24] Respondent adjusted petitioner's 1976 charitable contribution carryover "Due to adjustments in prior years." Petitioner appears to argue that respondent could not adjust his 1976 charitable contribution carryover deduction for the same reason that she allegedly could not adjust his 1976 NOL carryover deduction. We disagree; respondent may adjust petitioner's 1976 charitable contribution carryover deduction for the same reason that she may adjust his 1976 NOL carryover deduction.

petitioner is mistaken in his reliance on that case. In *Powell,* the taxpayer computed her 1981 tax liability using income averaging. See generally secs. 1301-1305 (rules for income averaging). Computations for income averaging required that the taxpayer determine his or her taxable income for the previous 4 taxable years (base-period years). See sec. 1302. The Commissioner examined the taxpayer's 1981 taxable year, and, in connection therewith, the taxpayer signed a Form 872-A that contained the same restrictive language as clauses (e) and (f) above.

The Commissioner subsequently adjusted the taxable income of the taxpayer for 1979 and 1980, two of the base-period years, and the taxpayer agreed with the adjustments; the taxpayer signed a Form 906, Closing Agreement on Final Determination Covering Specific Matters, for her 1979 and 1980 taxable years. The Commissioner thereafter determined that the taxpayer no longer qualified for income averaging and issued her a notice of deficiency based in part on an adjustment disallowing its use. The taxpayer petitioned the Court and argued that the Commissioner's income-averaging adjustment was time barred because it was outside the scope of the restrictive language in Form 872-A.

The primary issue for the Court's decision was whether the Commissioner's determination that the taxpayer was not allowed to use "income averaging" was within the restrictive language of the Form 872-A. The Court held that the Commissioner's income-averaging adjustment was within the realm of this restrictive language because it was a "consequential [change] to other items based on such adjustments". The Court allowed the taxpayer to use income averaging, but allowed the Commissioner to redetermine the taxpayer's income averaging computation taking into account her adjustments for the 1979 and 1980 years.

Although the Court specifically stated that the Commissioner could make her determination taking into account only the adjustments for 1979 and 1980, *Powell* is distinguishable because it did not involve, as the present case does, an adjustment made to a barred year in order to recalculate the amount of the NOL that may be carried forward from that year to an open year. Such an adjustment, unlike the income-averaging adjustment in *Powell,* falls squarely within the restrictive language of the Form 872-A here

involved, which applies to "any carryover or continuing tax effects caused by any adjustments to any prior taxable year".

### 4. *Whether Respondent Calculated Correctly Petitioner's Income Tax Deficiency for 1976*

Petitioner questions the correctness of respondent's determination of his NOL deduction stemming from the Saints, alleging that she determined his deduction using the adjustments listed in Forms 875. At trial, petitioner solicited testimony from a purported expert; according to petitioner, this "expert testimony was limited in its intended use. It was introduced as evidence that * * * the amortization period used by the partnership is equally reasonable with that purportedly now being used by respondent." Respondent counters that petitioner cannot challenge the adjustments listed in Forms 875. In other words, respondent contends, petitioner is bound to the amounts listed in Forms 875 because he "was personally satisfied with the resolution of the partnership audit".

We disagree with respondent's assertion that petitioner is bound by the adjustments listed in Forms 875; the execution of a Form 875 is not binding on a partner and does not prevent a partner from challenging the merits of the adjustments presented in the form. *C.H. Leavell & Co. v. Commissioner,* 53 T.C. 426, 438-439 (1969). We hold for respondent, however, because petitioner has failed to meet his burden of proof. Rule 142(a); *Welch v. Helvering,* 290 U.S. 111, 115 (1933). Petitioner presented no credible evidence to rebut respondent's determination reflected in her notice of deficiency. Although petitioner introduced testimony from an "expert", we give this testimony absolutely no weight. Accordingly, petitioner failed to establish that the correct amortization period for any of the partnership's assets is different from that determined by respondent.

We have considered all other arguments made by petitioner and find them to be without merit.

To reflect the foregoing,

*Decision will be entered for respondent.*