T.C. Memo. 2003-130


UNITED STATES TAX COURT


KYL CHRISTIANS, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 9814-01.                    Filed May 5, 2003.


<u>Ted E. Merriam</u> and <u>Kevin A. Planegger</u>, for petitioner.

<u>Richard D. D'Estrada</u> and <u>Frederick J. Lockhart, Jr.</u>, for
respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


GERBER, <u>Judge</u>:  In a statutory notice of deficiency, mailed
on May 4, 2001, respondent determined deficiencies in
petitioner's Federal income tax and penalties for the taxable
years 1992, 1993, and 1994 as follows:

| Year | Deficiency | Penalty Sec. 6663 |
|------|-----------|-------------------|
| 1992 | $4,831 | $3,623.25 |
| 1993 | 12,115 | 9,086.25 |
| 1994 | 18,912 | 14,184.00 |

Petitioner contends that respondent is barred from assessing the income tax deficiencies because the notice of deficiency was mailed after the expiration of the 3-year period for assessment provided for in section 6501(a).[1]  Respondent contends that the period for assessment remains open under section 6501(c)(1) because petitioner filed false and fraudulent returns for the years in question.  In the alternative, respondent contends, and petitioner concedes, that the period for assessment remained open for 1994 because of the substantial understatement of gross income by more than 25 percent.  In such circumstances, section 6501(e) provides for a 6-year period for assessment.

We consider here whether petitioner's understatements for taxable years 1992, 1993, and 1994 were due to fraud.  In the event we do not find petitioner's understatement for taxable year 1994 was due to fraud, respondent may assess the deficiency under section 6501(e).

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT[2]

Petitioner resided in Loveland, Colorado, at the time his petition was filed in this case.  For taxable years 1992, 1993, and 1994, petitioner owned and operated a construction business, which did business under the name of K&L Exteriors Trim (K&L Exteriors).  The business of K&L Exteriors was residential construction, in particular house framing and siding work.

Petitioner graduated from high school in 1986 and then began employment as a construction laborer.  After 1 year, petitioner began full-time attendance at Aims Community College.  Following his first year, petitioner transferred to the University of Northern Colorado, which he attended for 1 year.

After his second year of college, petitioner moved to Minnesota to work for his grandfather, who owned and operated an electric motor repair business.  He worked for his grandfather for approximately 1 year.  He subsequently moved back to Colorado and re-enrolled in the University of Northern Colorado.  He attended for two quarters and then transferred for an additional semester to Colorado State University for an additional semester, where he studied a specialized curriculum on construction. Petitioner did not earn a college degree.

---

[2] Some facts have been stipulated by the parties and are herein incorporated by this reference.

During his final semester at Colorado State University, petitioner worked part time for George Moore Construction earning between $6 and $7 per hour.  Petitioner acquired first-hand knowledge of the need for residential construction services and believed he could earn more money by operating his own construction business.  During 1992, when petitioner was approximately 24 years old, his father lent him approximately $500 to $600 to start a construction business, under the name K&L Exteriors Trim (K&L Exteriors).  K&L Exteriors began with two to three employees, and business was generated by word of mouth or by petitioner's contacts with other contractors at job sites.  K&L Exteriors did not maintain any inventory, and its business consisted of providing services in the form of labor.

During 1993, petitioner organized a corporation called Four Square Construction, Inc. (Four Square), for the sole purpose of providing payroll services for K&L Exteriors.  K&L would transfer funds to Four Square each month, and then Four Square would distribute the funds to the employees.

Petitioner did not have the business acumen to manage the administrative side of the business.  Petitioner managed and performed the construction services, and he relied on his father to manage the administrative matters, including the bookkeeping.  Petitioner trusted his father and was aware of his father's prior experience in administrative business matters, including his

father's management of petitioner's mother's cleaning service business. Petitioner did not question his father and would sign, without careful consideration, documents his father had prepared.

The administrative business services for petitioner's and his mother's businesses were performed in petitioner's parents' home, where the books and records were maintained. Petitioner lived with his parents in that home until sometime during 1994. When the number of documents necessary for petitioner's business became voluminous, petitioner's father requested a facsimile stamp of petitioner's signature for use on business documents.

A business checking account was maintained for K&L Exteriors. That account was used for payment of petitioner's personal and business expenses. During the period under consideration, petitioner was provided by his father with approximately $350 a week for living expenses. Petitioner was aware that K&L Exteriors' weekly receipts exceeded $350, and he thought that the excess was being retained and/or used for operating expenses.

Petitioner's father also managed the preparation of petitioner's individual and business tax returns. Petitioner's father retained Doneta Layland, owner-operator of Tax Consultants, to prepare petitioner's tax returns. Petitioner's father would provide the information necessary to prepare the tax returns to Ms. Layland. Petitioner had no contact with Ms.

Layland, and she did not find it unusual that petitioner's father handled the tax matters because that type of situation occurred with other clients.

Ms. Layland was often frustrated by the inadequate and inaccurate tax preparation records petitioner's father submitted to her. For example, the cashflow statement for K&L Exteriors for the taxable year 1993 reflected gross receipts of $160,397, while the Forms 1099 filed by clients of the business reflected a lesser amount ($111,516). Through communications with petitioner's father, Ms. Layland came to realize that the cashflow statement figure was incorrect. Accordingly, she reported the amount reflected on the Forms 1099. Petitioner's father also commingled petitioner's personal and business expenses, which Ms. Layland attempted to distinguish and separate. Ms. Layland did not contact petitioner about any of these matters. She dealt exclusively with petitioner's father, who resolved these matters to Ms. Layland's satisfaction. On one occasion, Ms. Layland questioned petitioner's father about a loss on petitioner's 1993 Schedule C, Profit or Loss From Business. Petitioner's father responded with new figures which reflected a small profit.

For taxable years 1993 and 1994, Ms. Layland also prepared Four Square's corporate returns for petitioner. Because Four Square was incorporated solely for K&L Exteriors' payroll

needs, Four Square's receipts matched its expenses, and its corporate returns did not reflect taxable income.

Petitioner's 1992, 1993, and 1994 income tax returns were filed on May 4, 1993, May 16, 1994, and May 8, 1995, respectively. The Schedules C attached to petitioner's 1992, 1993, and 1994 income tax returns reflected taxable income of $635, $304, and $360, respectively. All three returns were signed by petitioner and dated April 29, 1993, May 8, 1994, and May 3, 1995, respectively. As with other documents relating to K&L Exteriors and Four Square, petitioner did not read or review them before signing. At the time of signing the 1992, 1993, and 1994 returns, petitioner believed the information reported was accurate.

Petitioner now agrees that the gross income from his construction business was understated by $9,690, $37,204, and $52,440 for 1992, 1993, and 1994, respectively. He also agrees that interest income was understated by $24 and $11 for 1992 and 1993, respectively.

During August 1994, petitioner, in the process of obtaining a personal loan, estimated his monthly income to be $3,200. At this time, petitioner was receiving a $350 weekly check from his father. In December 1994, petitioner sought another loan in order to purchase a home. Petitioner knew that he had to have a certain level of income to qualify for a home loan. In response

to the loan officer's questions, petitioner estimated that his monthly income was $5,217. Petitioner signed and dated the loan application. In mid-March 1995, petitioner entered into a contract to purchase a home for $140,000.

The mortgage company requested petitioner's income tax returns from the previous 2 years. Petitioner telephoned his father and requested copies of his income tax returns for taxable years 1993 and 1994. Petitioner obtained copies of his income tax returns from his father and submitted them to the mortgage company without reviewing them. The 1993 return submitted to the mortgage company reflected Schedule C net income of $51,297. This return differed in the amount of income from the one filed with the Internal Revenue Service. There were also differences in petitioner's signatures. The date reflected on the return provided to the mortgage company was April 15, 1994, and was not in petitioner's handwriting.

The 1994 income tax return submitted to the mortgage company reflected Schedule C net income of $50,685, an amount different from that reported to respondent. These returns also contained differences in petitioner's signatures. The date reflected on the 1994 return provided to the mortgage company was February 2, 1995, and was in petitioner's handwriting.

Petitioner did not read any of the loan documents relating to the purchase of the home. Instead, the loan officer explained

the documents, and then petitioner signed them. The closing date for petitioner's home purchase was July 28, 1995. On that date, petitioner signed a Universal Residential Loan Application, which reflected that his monthly income was $4,137. Petitioner believed this figure was derived from his income tax returns.

In the course of an examination of another taxpayer regarding employee wage deductions, respondent began an examination of petitioner's returns. For taxable year 1991, petitioner admitted to respondent's agent that he did not report approximately $2,000 in wages he had received for part-time construction work.

Respondent's examining agent referred petitioner's tax examination to the Criminal Investigation Division. In the course of the investigation, respondent's special agent (1) interviewed contractors to determine whether K&L had reported all of its income through a specific item analysis, (2) interviewed Ms. Layland regarding the preparation of petitioner's income tax returns, and (3) sought out other potential sources of income. In so doing, the special agent discovered: (1) Petitioner's mortgage applications, (2) that petitioner's father had sole contact with Ms. Layland, (3) that petitioner timely filed his income tax returns, (4) that petitioner's return for 1992 did not include income received from a contractor, (5) that petitioner's return did not include $11 of interest income, (6)

that petitioner did not deal in cash, (7) that K&L Exteriors was one of the least sophisticated operations he had seen, (8) that petitioner paid approximately $90 in self-employment tax for taxable year 1992 and a minimal amount of income tax, and (9) that petitioner reported no income tax or self-employment tax liability for taxable years 1993 and 1994.

The special agent did not discover evidence showing an overstatement of expense deductions or illegal activities or that Four Square was used for any improper purposes. At the conclusion of the criminal investigation, the special agent recommended criminal prosecution of petitioner and petitioner's father for taxable years 1993 and 1994. The record does not reflect the disposition of these matters.

## OPINION

The parties have narrowed the focus of this case. Petitioner agrees that there was unreported income and, hence, underpayments of tax for 1992, 1993, and 1994. However, the 3-year period for assessment, provided for in section 6501(a), had expired with respect to all 3 taxable years at the time respondent mailed the notice of deficiency to petitioner. Respondent, in his answer, affirmatively alleged that the understatement of tax for each of the 3 years is due to fraud and, therefore, that the period for assessment remained open at the time the notice was mailed. See sec. 6501(c)(1).

Accordingly, the initial and principal question we consider is whether "any portion of * * * [the underpayments] is attributable to fraud". Sec. 6663(b).

I. Whether Petitioner Filed Fraudulent 1992, 1993, or 1994 Income Tax Returns

For purposes of defining fraud, it is important to note that the definitions of fraud in sections 6663 and 6501 have been held to be interchangeable. Rhone-Poulenc Surfactants v. Commissioner, 114 T.C. 533, 548 (2000) (and cases cited therein); Murphy v. Commissioner, T.C. Memo. 1995-76. Fraud is an intentional wrongdoing on the part of the taxpayer with the specific purpose to evade a tax believed to be owing. McGee v. Commissioner, 61 T.C. 249, 256 (1973), affd. 519 F.2d 1121 (5th Cir. 1975); Terrell Equip. Co. v. Commissioner, T.C. Memo. 2002-58. The Commissioner bears the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b); Zell v. Commissioner, 763 F.2d 1139, 1142-1143 (10th Cir. 1985), affg. T.C. Memo. 1984-152; Terrell Equip. Co. v. Commissioner, supra.

To satisfy his burden, the Commissioner must show that (1) an underpayment exists; and (2) the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. Parks v. Commissioner, 94 T.C. 654 692 (1970). The existence of fraud is a question of fact to be resolved from the entire record. DiLeo v. Commissioner, 96 T.C. 858, 874 (1991), affd. 959 F.2d 16 (2d

Cir. 1992).  Because direct proof of a taxpayer's intent is rarely available, fraud may be proven by circumstantial evidence, and reasonable inferences may be drawn from the relevant facts. Spies v. United States, 317 U.S. 492, 499 (1943); Stephenson v. Commissioner, 79 T.C. 995, 1006 (1982), affd. 748 F.2d 331 (6th Cir. 1984).  Mere suspicion, however, does not prove fraud.  Katz v. Commissioner, 90 T.C. 1130, 1144 (1988).

Courts have developed a nonexclusive list of so-called badges of fraud which demonstrate fraudulent intent: (1) Understating income, (2) maintaining inadequate records, (3) providing implausible or inconsistent explanations of behavior, (4) concealing income or assets, (5) failing to cooperate with taxing authorities, (6) engaging in illegal activities, (7) engaging in a pattern of behavior which indicates an intent to mislead, (8) testifying with a lack of credibility, (9) filing false documents, (10) failing to file tax returns, and (11) dealing in cash.  Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Recklitis v. Commissioner, 91 T.C. 874 (1988); Middleton v. Commissioner, T.C. Memo. 2002-164.  The sophistication, education, and intelligence of the taxpayer are relevant in determining fraudulent intent. Niedringhaus v. Commissioner, 99 T.C. 202, 211 (1992).

A. <u>In General</u>

The record in this case reflects a general pattern of dereliction, but not one of deceit and fraud. There can be no doubt that petitioner's reliance upon his father was misplaced and in no way relieved petitioner of his obligation to correctly report his tax liability. Petitioner may not avoid his duty to accurately report by placing the responsibility on an agent. See <u>United States v. Boyle</u>, 469 U.S. 241, 250-251 (1985). There is ample evidence, as observed by his return preparer, that petitioner's tax records were inaccurate and inadequate and commingled personal and business items. Petitioner knew that his earnings exceeded the $350 received weekly from his father for personal expenses. But petitioner was not aware of the particulars of his tax reporting, including the amount of income reported on his Federal income tax returns. In spite of his laxity and inattention to the administration of his business, petitioner did not intend to evade tax by conduct intended to conceal, mislead, or prevent the collection of tax.

Petitioner's forte was in the operational side of his construction business. He was young and inexperienced regarding the administrative necessities of his business. As a result, petitioner relied exclusively on his father to look after the administrative matters, including tax reporting. Petitioner perfunctorily signed documents, including tax returns, that his

father prepared and placed before him for signature. Additionally, there has been no showing that petitioner collaborated or colluded with his father to defraud the Government. Respondent has not shown, on this record, that petitioner attempted to defraud. We have reached this conclusion after considering the specific criteria for fraud and whether the "badges of fraud" existed in this case.

Fraud may be proven by circumstantial evidence and reasonable inferences drawn from the facts. Spies v. United States, supra. A taxpayer's course of conduct or a pattern of conduct may establish, by inference, the intent to conceal or mislead. Id. at 499; Otsuki v. Commissioner, 53 T.C. 96, 105-106 (1969). Respondent contends that the 3-year pattern of underreporting income is evidence from which we should infer petitioner's intent to conceal or mislead. It has been held that a pattern of underreporting of income over an extended period may be indicative of fraud, but the mere failure to report is not sufficient to establish fraud. Petzoldt v. Commissioner, 92 T.C. 661, 700 (1989) (and cases cited thereat).

Petitioner concedes that his income was underreported for the 3 years. Petitioner, however, contends that he relied (reasonably or unreasonably) upon his father and that he was without sufficient knowledge to be culpable and/or that he did not formulate a specific intent to evade tax, conceal, or

defraud.  We have carefully considered the evidence, including petitioner's testimony, which we found credible.  We hold that the under reporting here does not, when considered in light of the record in its totality, show or raise an inference that petitioner intended to conceal or mislead.

We find the circumstances here to be somewhat unusual.  The combination of petitioner's inexperience, immaturity, and reliance on his father make his position plausible.  It must be noted that the three Federal income tax returns under consideration represent some of the first ones that petitioner filed, and he continued to live with his parents throughout most of the period under consideration.  In addition, this was petitioner's first self-employment business experience.

The Commissioner has relied upon taxpayers' understatements of income to circumstantially show fraudulent intent and has been successful in numerous fraud penalty cases where such understatements were coupled with other badges of fraud.  In a few cases, however, the Commissioner has failed to establish a link between understatements and fraudulent intent.  In Rao v. Commissioner, T.C. Memo. 1996-500, the fraud penalty was not sustained even though the taxpayer, a doctor, had substantial and consistent understatements of gross income.  In that case, the taxpayer relied on his accountant, in the same manner as petitioner has relied on his father.  In another case, involving

a doctor whose income was consistently and substantially understated, the taxpayer's reliance on his accountant was a factor in the Court's holding that the Commissioner failed to clearly and convincingly prove fraud. Zipp v. Commissioner, T.C. Memo. 1998-371.

B. Whether There Was a Pattern of Behavior Which Indicates an Intent To Mislead

Respondent points out that petitioner, in the process of applying for loans, provided monthly income figures to lenders that reflected that he knew that he was underreporting his income. During 1994, petitioner sought a $5,100 personal loan, and he estimated that his monthly income was $3,200. A few months later petitioner began the process of purchasing a home, and in documents submitted to secure a $140,000 mortgage loan, he estimated that his monthly income was $5,217 on one occasion and $4,137 on another.

When the home loan was being finalized, the mortgage company requested copies of petitioner's 2 prior years' Federal income tax returns. Petitioner obtained the copies of the returns from his father and provided them to the mortgage company. Unlike the returns filed with respondent, which reported insignificant amounts of net income from the construction business, the copies supplied to the mortgage company reflected annual net income in the low $50,000's. In addition, there were some discrepancies

with respect to the signatures on the returns supplied to the mortgage company.

Respondent argues that these circumstances indicate petitioner's knowledge that the income reported to the Government was understated. Petitioner does not deny that there were discrepancies and that the amounts reported to respondent differed from the amounts contained in the return documents provided to the mortgage company. Petitioner, consistent with his approach to business documents and procedures, was not cognizant of the contents of the returns presented to the various recipients or of the taxable income that was being earned from his business activity. Petitioner did not have working knowledge of the administrative side of his business and followed his father's guidance on those aspects of his business.

There has been no evidence, circumstantial or otherwise, that would lead us to find that petitioner was aware of the discrepancies or that he colluded with his father in an attempt to deceive the Government or the mortgage company. Even if petitioner's father intended to conceal, deceive, and defraud, such a finding would not automatically be imputed to petitioner.

Respondent, relying on United States v. Bornfield, 145 F.3d 1123, 1129 (10th Cir. 1998), contends that petitioner cannot, by burying his head in the sand, avoid blame for any deception by his father. Bornfield, a criminal case, involved a "deliberate

ignorance instruction" to a jury.  It was held that such an instruction "is appropriate if the defendant denies knowledge of an operative fact and the evidence demonstrates or creates the inference that the defendant deliberately avoided actual knowledge of that fact."  Id. (citing United States v. Lee, 54 F.3d 1534, 1538 (10th Cir. 1995)).  As we have found, petitioner did not collude with his father or deliberately avoid knowledge to avoid culpability.  Accordingly, United States v. Bornfield, supra, is not analogous to our circumstances.

In conjunction with that approach, respondent also argues that petitioner's father's actions should be imputed to petitioner.  Respondent's position derives from joint and several liability cases.  In those cases, both spouses by the filing of a joint return were liable for any fraud penalty, irrespective of which spouse intended to evade the tax.  We note that the cases respondent relies on are dated and have been superseded by statute.  See, e.g., sec. 6663(c).

More importantly, the cases relied upon by respondent involve situations where one spouse was found to have intentionally evaded tax.  There has been no showing by clear and convincing evidence that petitioner's father intended to file a fraudulent return on his son's behalf.  Accordingly, there is no need to consider whether the concept of joint and several liability would apply in this case.

C.  Remaining Badges of Fraud

Petitioner points out that factually, respondent's case rests on the understatements and the information provided to lenders.  There has been no showing or allegation that petitioner (1) knowingly concealed income or assets, (2) failed to cooperate with respondent, (3)engaged in illegal activities, (4) attempted to mislead, (5) dealt in cash, (6) lacked credibility, or (7) knowingly filed false documents.

On this record we conclude and hold that respondent has failed to prove by clear and convincing evidence that petitioner intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes.  Accordingly, the exception for fraud did not serve to keep the assessment period for 1992, 1993, or 1994 open under section 6501(c).

II.  Respondent's Alternative Argument Concerning Section 6501(c)(1)

Respondent also argues that, for purposes of indefinitely extending the period for assessment under section 6501(c)(1), petitioner's state of mind is irrelevant.  Section 6501(c)(1) provides for an exception to the 3-year period for assessment of section 6501(a), as follows:

> False Return.  In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time.

Respondent argues that the statute requires only an "intent to evade tax." Under respondent's position the intent to evade may be imputed to the taxpayer from a third person. In the setting of this case, respondent would have us impute to petitioner any intent to evade tax that petitioner's father may have had. Under respondent's interpretation, the period for assessment would remain open indefinitely in a situation where, as here, a taxpayer is found not to have intended to evade tax, but some third person involved in the reporting of income did so intend.

Assuming arguendo that respondent's interpretation of section 6501(c)(1) is correct, for respondent to be successful in this case, he first would have to establish the factual predicate that petitioner's tax preparer/father had an "intent to evade tax". With respect to extending the period for assessment, respondent bears the burden of proof. Mecom v. Commissioner, 101 T.C. 374 (1993), affd. without published opinion 40 F.3d 385 (5th Cir. 1994). We have found that respondent has not shown by clear and convincing evidence that petitioner intended to evade tax when he signed the returns in question. We have also found that respondent has not shown that petitioner's father/return preparer intended to evade tax. Therefore, the question of whether respondent's interpretation of section 6501(c)(1) is correct is rendered moot.

Accordingly, the period for assessment for 1992, 1993, or 1994 did not remain open under the provisions of section 6501(c)(1).  Because of petitioner's concession that the 1994 assessment period was open under section 6501(e), petitioner remains liable for an income tax deficiency based on the agreed underpayment for his 1994 tax year.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155.</u>